Dovid L. **KRAFCHOW**, Plaintiff,

v.

**TOWN OF WOODSTOCK**, Defendant.

No. 96–CV–1538 (LEK/DRH).

United States District Court,
N.D. New York.

Aug. 18, 1999.

Office of Russell A. Schindler, Kingston, New York, for the plaintiff, Russell A. Schindler, of counsel.

Donohue, Sabo, Varley & Armstrong, P.C., Albany, New York, for defendant, Kenneth G. Varley, of counsel.

## MEMORANDUM—DECISION AND ORDER

KAHN, District Judge.

### I. Introduction

On April 25, 1996, Defendant Town of Woodstock ("Defendant" or "the Town") passed Local Law # 1 of 1996 (the "Vending Law"), which prohibited commercial activities anywhere in the Town without a license and absolutely prohibited commercial activities on the Village Green. The Vending Law, however, provided an exemption for, inter alios, political candidates and political parties. In August 1996, Plaintiff Dovid Krafchow ("Krafchow") was charged with and convicted of violating the Vending Law. The summons issued against Krafchow alleged that while on the Village Green, he charged a fee for the service of reading Tarot cards and for the sale of posters. Krafchow now brings this action pursuant to 42 U.S.C. § 1983 (1994) claiming that the Vending Law was unconstitutional and effected a violation of his First Amendment rights to free speech and freedom of religion. Presently before this Court are cross-motions for summary judgment.

### II. Background

Krafchow is a fifty-four-year-old Vietnam veteran who began studying the Torah at the age of twenty-six (26). Between 1980 and 1990, Krafchow lived in Israel where he studied the "more mystical side of the Torah." Upon his return to the United States, he worked for a publishing company for a little over one year. With the exception of reading Tarot cards, Krafchow has been unemployed since that time.

Krafchow claims that he became inspired to read Tarot cards in the early 1990's when, while browsing through a book store in New York City, he noticed a particular book that related Tarot cards to the Kabala, the combined wisdom of ancient Jewish mysticists. Krafchow claims that he "started to do [readings] just as a hobby," but then "had this idea that [he] could use it really as an art form." He spent some time performing the readings at various locations in New York City and then in or around the summer of 1994, moved up to Woodstock, New York.

During that summer, and indeed during the summers of 1995 and 1996 as well, Krafchow performed his Tarot readings in the Town and on the Village Green with at least the tacit approval of the Town Board. That is, there was some initial objection to his activities from Tracy Kellogg ("Kellogg"), a member of the Town Board,[1] but with the advice of counsel, the Town Board permitted Krafchow to remain. The understanding between Kellogg and Krafchow was that he could continue to perform his services and to collect money for both the readings and his merchandise provided the money was received in the form of donations and not as a charge or a fee. In August 1996, however, the relationship between the parties soured.

On August 25, 1996, Krafchow was given a summons to appear in Town Court for allegedly violating the Town's Vending

---

**1.** During the time period relevant for the instant action, however, Kellogg was the Town supervisor.

Law by engaging in commercial activity on the Village Green. Section 2 of the Vending Law prohibited vending on the Village Green:

> Notwithstanding anything to the contrary contained in this local law, no vending shall be allowed on the property known as the Village Green or the property transferred to the Town of Woodstock by the deed recorded in the Ulster County Clerk's Office in Deed Book 1741, at page 189, being the parcel of land on which the Woodstock Chamber of Commerce booth now exists.

Varley Aff.Ex. A, L.L. # 1/96 § 2. The law defined a "vendor" as "[a]ny person, ... who on public property sells or barters or offers for sale or barter or carries or displays for sale or barter any goods, wares, merchandise or services." *Id.* § 1. According to the Vending Law's preamble, the law's purpose was to control pedestrian and vehicular traffic through the Town, particularly the area in and around the Village Green:

> It is the intent of the Town of Woodstock to assure vending on public property in the Town is conducted in a safe and peaceful manner without undue inconvenience to Town residents.... It is hereby found that to protect both vehicular and pedestrian traffic, particularly in the Center of Town, vending on public property shall be conducted only from those locations designated by the Town Board, and each vendor shall be assigned a specific space, as available, in the designated locations for the term of the license.

*Id.* Particularly pertinent for the instant motions is the fact that section 3 of the Vending Law set forth the following exemptions:

(1) Any person acting pursuant to statute or court order;

(2) Candidates for elective or party offices, or persons acting in behalf of any such candidates or for a political party;

(3) Persons vending from private property pursuant to the Town of Woodstock Zoning Law, including yard or garage sales;

(4) Persons vending from door-to-door.

*Id.* at § 3. One found guilty of violating the Vending Law could have been fined up to two-hundred-and-fifty dollars ($250.00) for each day that a violation occurred. *Id.* § 16(A). In addition, if the alleged violator did not remove his or her merchandise and belongings immediately upon receipt of a summons, he or she faced the possibility that his or her merchandise and belongings could be confiscated by the Town Police. *Id.* § 16(B).

Because Krafchow did not fall within any of the above exemptions and there was some question as to the legality of his activities, the Town's police department decided to investigate.[2] As part of that investigation, Officer James DiMele ("DiMele") approached Krafchow in plain clothes and asked him to perform a card reading. During the reading, DiMele alleges that an individual or individuals asked to take Krafchow's photo. According to Officer DiMele, Krafchow responded that he sold posters of himself for five dollars ($5.00).[3] At the conclusion of DiMele's reading, he asked Krafchow how much it would cost. Krafchow responded that people generally gave between ten-to-twenty dollars ($10.00–20.00). DiMele paid Krafchow twenty dollars ($20.00) and then offered to purchase one of Krafchow's posters. Noting DiMele's generosity, Krafchow stated that DiMele could have the poster for free.

---

2. Apparently, the Town Police Department responded to complaints from Kellogg that Krafchow may be violating the Vending Law.

3. Krafchow admits that he told the individual or individuals that he or they could buy a poster for five dollars ($5.00). Krafchow Dep. at 32. Indeed, he claims that over the course of that summer, he sold approximately five (5) posters. *Id.* at 31.

As a result of the foregoing, Krafchow was tried and convicted in Woodstock Town Court of violating the Vending Law. The Vending Law was repealed on April 8, 1997, and over the course of its brief existence, Krafchow was the only individual prosecuted thereunder.

Krafchow contends that the Vending Law was an invalid time, place, or manner restriction of protected activity and, thus, effected a violation of his First Amendment rights to speech and to religion. Both parties move for summary judgment as to liability.

### III. Discussion

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). A genuine issue is an issue that, if resolved in favor of the non-moving party, would permit a jury to return a verdict for that party. *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

When the moving party has met the burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. At that point, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. To withstand a summary judgment motion, evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–249, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. Thus, summary judgment is proper where there is "little or no evidence ... in support of the non-moving party's case." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–1224 (2d Cir.1994) (citations omitted). The instant case is reviewed with the foregoing standards in mind.

The First Amendment, made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law ... prohibiting the free exercise [of religion]; or abridging the freedom of speech...." U.S. CONST. amend. I. "The First Amendment literally forbids the abridgment only of 'speech,' but [the Supreme Court has] long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). In that vein, the Second Circuit noted that First Amendment protections have been extended to entertainment, film, theater, music, peaceful marches, sit-ins, and parades. *See Bery v. City of New York,* 97 F.3d 689, 694 (2d Cir.1996). *See also Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 231, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) ("[O]ur cases have never suggested that expression about philosophical, social, artistic, economic, literary or ethical matters ... is not entitled to full First Amendment protection") (footnote omitted). Moreover, relative to both freedom of religion and freedom of speech, First Amendment "protection is [not] lost because the ... materials sought to be

distributed are sold rather than given away or because contributions or gifts are solicited in the course of propagating the faith." *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (citations omitted); *see also Riley v. National Fed'n of Blind of North Carolina,* 487 U.S. 781, 801, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak."); *Murdock v. Commonwealth of Pennsylvania,* 319 U.S. 105, 111, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) ("[T]he mere fact that the religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise....").

In the instant action, Krafchow claims that both the Tarot card readings and the sale of his posters were protected activities. Relative to the card readings, Krafchow asseverates that the Tarot cards are "rife with symbolism." Pl.'s Mem. at 3. He contends that he interprets the symbolism of the cards based on his knowledge of the Kabala and the Torah. *See* Krafchow Dep. at 15 (Q. "When you use the Tarot cards, whatever you do with them, it is based on your own interpretations of the Torah?" A. "That's right."). According to Krafchow, the symbols on the face of the cards are connected to the Jewish faith because the cards were developed at the time of Alexander the Great when teaching, including teaching about the Torah, was banned. In order to continue teaching without being punished, the Jewish people developed the cards as a means of conveying principles of their faith while giving the appearance of mere entertainment.

Defendant, on the other hand, contends that the Vending Law is solely a regulation of commercial activity and, therefore, has First Amendment implications relative to one's speech only if the commercial activity so regulated is inseparably intertwined with a particularized message. Defendant also claims that Krafchow's posters are self-promotional and are not connected with the pronouncement of any religious, political, or philosophical message and thus warrant no protection. Furthermore, Defendant claims that the law does not infringe Krafchow's right to freedom of religion because he is not required to use the Tarot cards in order to practice his faith.

A. Freedom of Speech

"To determine whether conduct is imbued with ... elements of communication, the Supreme Court has asked whether an intent to convey a particular message was present and whether there was a great likelihood that the message would be understood by the viewer or listener." *Montefusco v. Nassau County,* 39 F.Supp.2d, 231, 242 n. 6 (E.D.N.Y.1999) (citing Supreme Court cases where conduct has been protected because of its ability to express a message to a third party). To satisfy this standard, then, one must have both a message and an audience. This Court finds that both the card readings and the poster sales were protected activities because Krafchow meets both of these requirements.

Krafchow submitted several samples of the cards he used, one of which specifically includes "Tora" in its depiction, Krafchow Aff.Ex. B, and another has several representations of the Star of David. *See id.* Ex. D. Obviously, one can make an association that at least on its surface links the depicted symbols with the Torah or the Jewish faith. Extracting more from the cards beyond the obvious link requires some measure of interpretation. The regulated activity of card reading is thus "inseparably intertwined" with a particularized message. *Young v. New York City Transit Auth.,* 903 F.2d 146, 153 (2d Cir. 1990). In essence, Krafchow's "speech" is not a form of proselytizing concomitant with the card reading; rather, it *is* the actual card reading. The mere fact that his service is sold instead of volunteered is

without difference here. *See, e.g., Riley,* 487 U.S. at 801, 108 S.Ct. 2667 (stating that speaker's rights are not lost merely because compensation is received).

Krafchow contends that through communicating with his "customers" he teaches by attempting to give his patrons a heightened sense of spirituality. Whether any given patron views the exercise as pure entertainment or as somehow personally enlightening is irrelevant. The likelihood that one would understand the message conveyed is dependent upon Krafchow's ability to communicate with a customer and the customer's own beliefs; considerations which are too subjective and specific to alter the course of a constitutional analysis.

This Court hastens to note that by finding Krafchow's activities protectable as speech, it is not pronouncing a broadly applicable constitutional right to perform Tarot readings. Rather, the circumstances presented here are quite unique. Defendant does not dispute Krafchow's claim that he spent ten (10) years in Israel where he devoted considerable time studying the Kabala. Nor does Defendant contest Krafchow's claim that beyond that ten-year period, he studied both the Kabala and the Torah for more than half of his adult life. Krafchow's claim that his readings are based on interpretations of religious text is afforded more merit here than it perhaps would otherwise.

Relative to the posters, while they were not connected to his card readings per se, they were also protected under the First Amendment as visual art. *See gen. Bery,* 97 F.3d at 695 ("Visual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection.") (footnote omitted). The poster is approximately 15.5″ × 20″ and it has "Woodstock N.Y." printed in black lettering at the very bottom over a blue and green background. Just above that are two mirror images of Krafchow holding a staff and seated at a table with his Tarot cards before him. Moving further up on the face of the poster, two rows of "head shots" of Krafchow are shown from different angles on a violet and yellow background. The yellow portions of the poster are made to look like flames emanating from behind the two rows of photographs. At the very top-middle portion of the poster is another photo of Krafchow wearing a multi-colored t-shirt in a different pose and with the words "Life is Art" printed slightly above. At the very least, the poster attempts to convey its express philosophical message. Whether some self-promotion or advertisement is connected to the message is not dispositive. Consequently, this Court finds that both the card readings and the poster sales were protected activities.

■ Having found that Krafchow's activities were protected under the First Amendment, this Court now considers whether the Vending Law was a proper time, place, or manner restriction. The government bears the burden of demonstrating that a time, place, or manner restriction is lawful. *See Eastern Conn. Citizens Action Group v. Powers,* 723 F.2d 1050, 1052 (2d Cir.1983). In order to balance the appropriate considerations and assess each party's ability to satisfy its respective burden, this Court first sets forth the standard against which it will measure the constitutionality of the Vending Law.

■ This depends in part upon the forum at issue. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). " '[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.' " *United States v. Kokinda,* 497 U.S. 720, 732, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (quoting *Heffron,* 452 U.S. at 650–51, 101

S.Ct. 2559) (in turn citing *Grayned v. City of Rockford*, 408 U.S. 104, 116–17, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) and *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302–03, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974)).

The Supreme Court has recognized the following three general types of forums: (1) "quintessential public forums . . . which by long tradition or by government fiat have been devoted to assembly and debate," such as "streets and parks"; *Perry Education Assn. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *see also Heffron*, 452 U.S. at 651, 101 S.Ct. 2559 ("A street is continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment."); (2) state-created semi-public forums opened "for use by the public as a place for expressive activity," such as school board meetings; and (3) nonpublic forums or public property "which is not by tradition or designation a forum for public communication." *Id.* If, the regulation affects a non-public forum, courts apply a reasonableness standard. *Kokinda*, 497 U.S. at 726, 110 S.Ct. 3115; *see also Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 572–573, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). If, however, a regulation affects speech in a public forum, courts animate a more stringent inquiry. *Kokinda*, 497 U.S. at 726, 110 S.Ct. 3115.

■ Here, the Town does not challenge Krafchow's contention that the Village Green and all of the sidewalk areas designated for commercial activity pursuant to the Vending Law were public fora.[4] Indeed, the Village Green is not fenced in or otherwise separated from public access; it is centrally located and near a bus stop. Though the Village Green is only a small area of approximately 145 feet by 50 feet, *see* Kellogg Dep. ¶ 4, an area "does not lose its status as a traditional public forum simply because it . . . is 'physical[ly] narro[w].'" *Frisby v. Schultz*, 487 U.S. 474, 480, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988). The case sub judice, therefore, concerns the regulation of speech in a public forum.

■ As·a result, the Town could have imposed "reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions '[were] justified without reference to the content of the regulated speech, that they [were] narrowly tailored to serve a significant governmental interest, and that they [left] open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). If the restriction was not content neutral, however, then the defendant must show how the restriction was narrowly tailored to fit a compelling state interest. *See Consolidated Edison Co. of New York, Inc. v. Public Service Comm'n of New York*, 447 U.S.

---

4. It is interesting to note that the Village Green is owned by the Dutch Reformed Church. The Town only has an easement over the property. Kellogg explained the arrangement between the Town and Church in the following manner: "[N]o commercial activity will occur on the Village Green without the church's consent. The understanding between the town and the church was not to allow for commercial activity." Krafchow Aff. Ex. G, Kellogg Dep. at 16. Had this "understanding" been at all practiced here or anywhere else indicated in the record, it may have complicated the analysis somewhat. Krafchow Aff. Ex. G, Kellogg Dep. at 17 (indicating that there was no understanding as to whether the Town or the Church would enforce the "no commercial activity" provision of the easement). The Vending Law, however, was promulgated by the Town and the Town reserved for itself the power to grant licenses and to enforce the provisions of the law. Krafchow was convicted by the Town under its law. As the record currently indicates, then, the Church had no relevant involvement here.

530, 536, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) ("[W]hen [a]regulation is based on the content of speech, governmental action must be scrutinized more carefully to ensure that communication has not been prohibited 'merely because public officials disapprove the speaker's views.'") (quoting *Niemotko v. Maryland,* 340 U.S. 268, 282, 71 S.Ct. 328, 95 L.Ed. 280 (1951)). *See also United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). The first issue to address, then, is whether the restriction imposed is content-neutral. *See Heffron,* 452 U.S. at 648, 101 S.Ct. 2559 ("A major criterion for a valid time, place and manner restriction is that the restriction may not be based upon either the content or subject matter of speech.") (internal quotations omitted).

■ "The principal inquiry in determining content neutrality ... in time, place, or manner cases ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. The *Ward* Court explained that

> [t]he government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.... Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech.

491 U.S. at 791–92, 109 S.Ct. 2746. The issue then is whether the effect the law has on different speakers is incidental or direct and whether or not it is justified with reference to content.

■ At the heart of the matter is section 3 of the Vending Law. That section provides that

> [t]he following persons are exempt from the provisions of this local law:
>
> (1) Any person acting pursuant to statute or court order;

> (2) Candidates for elective or party offices, or persons acting in behalf of any such candidates or for a political party;
>
> (3) Persons vending from private property pursuant to the Town of Woodstock Zoning Law, including yard or garage sales;
>
> (4) Persons vending from door-to-door.

Defendant contends that the Vending Law was content-neutral because it (1) established no disparity between one type of vendor and another and (2) did not differentiate between the content of the goods being sold. Neither contention is availing.

As a preliminary matter, the text of the Vending Law itself belies Defendant's claim that it does not differentiate between vendors. It expressly grants exemptions to certain individuals simply because they are running for political office, acting in behalf of one running for office, or acting in behalf of a political party. L.L. # 1/96 § 3. Defendant claims that this is in fact not an "exemption" because although section 3 is titled "Exemptions," "these are ... really ... clarifications of the extent of the law." Varley Aff. ¶ 5. *See also id.* at ¶ 6 ("The intention of the exemption section was to clarify the scope of the statute and to make clear that it does not apply to activities which do not primarily involve the sale of goods or merchandise or activities conducted on other than public property."). Defendant extends this reasoning to the political party/candidate exemption because "such persons would not fall within the definition of 'vendor' which is the class of persons regulated by the law." *Id.* at ¶ 6.

Defendant in effect would have this Court believe that the Town Board was just an excessively careful group of individuals who provided an unnecessary section in the law for purposes of reiterating the obvious. First, were this Court to accept Defendant's construction of the

Vending Law, it would have to violate a fundamental tenet of statutory interpretation which is to avoid a construction that would "render superfluous other provisions in the same enactment." *Freytag v. Commissioner,* 501 U.S. 868, 877, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (internal quotation marks omitted).

Second, given the text of the Vending Law, Defendant's contention in this regard is nearly apocryphal. Section 1 defines a "vendor" as "[a]ny person, ... who on public property sells or barters or offers for sale or barter or carries or displays for sale or barter any goods, wares, merchandise or services." L.L. # 1/96 § 1. Section 2 of the Vending Law makes it unlawful "for *any person* to act as a vendor on public property" without a license. *Id.* § 2 (emphasis added). The individuals exempted from the Vending Law, particularly political candidates, at least arguably fell within the scope of both sections 1 and 2. That is, a political candidate selling bumper stickers on a public sidewalk would fall squarely under the technical definition of a "vendor" as that term is defined in section 1. According to section 2, that candidate would also be in violation of the law. In order for the Vending Law to exempt the candidate, therefore, it had to specifically state that he or she was not covered.

Furthermore, the fact that the "Exemptions" section was indeed meant to act as a list of exemptions rather than of clarifications is evidenced by section 3(1) which exempts "[a]ny person acting pursuant to statute or court order." As in the case of a political candidate, one acting pursuant to a statute or a court order could have sold items on a public sidewalk without a license to do so and, therefore, run afoul of the Vending Law. These individuals were identified nowhere else in the law and so the "clarification" offered by the exemption for both the political candidate and the individual acting pursuant to a court order lies not in the fact of reiteration, but in rejecting a reading of the law that would bring these individuals within its ambit.

It is unclear what Defendant means to say when it asserts that the Vending Law did not differentiate between the nature of the goods being sold. The First Amendment guarantees freedom of speech as such, not freedom of speech conveyed through a particular medium. The regulation or prohibition of a particular good is constitutionally questionable and perhaps objectionable only when that regulation or prohibition jeopardizes one's ability to convey a particular idea. The issue is whether the good is acting as a vessel of speech. But that is a question that is one step removed from determining whether the speaker is being denied the right to speak; or whether an ordinance, regulation, or statute favors one speaker or message over another. Ultimately, then, addressing the effect a regulation has on a speaker or his message will typically incorporate concerns regarding the regulation of goods thereby rendering such concerns superfluous.

As a consequence, this Court now turns to the effect the Vending Law had on either the relevant speakers or their respective messages. The law prohibited any individual from engaging in "vending" activities without first being licensed to do so by the Town. Even if one obtained a license, he or she was not permitted to conduct his or her commercial activities on the Village Green. Political candidates, political parties, or those affiliated therewith, however, were exempt from any provision of the law. As a result, a political candidate, for example, could be a "vendor" anywhere in the Town including the Village Green. As applied by the Town, the Vending Law did not bring within its scope the actions of an individual who did not specifically charge for a good, merchandise, ware or service, but merely received "contributions" from "customers." *See* Krafchow Aff. Ex. G, Kellogg Dep. at 20 ("That to my knowledge if [Krafchow] was operating on the Village Green or at other locations within the town and was not charging for his services, said to who-

ever the client was, I offer my services, if you would like to make a donation, you may make a donation, however, I did not charge for my services, that I did not have the ability to regulate his operation.").

The matrix established by the Town's Vending Law thus differentiated between speakers based in part on their conduct (sales) and in part based on their affiliation (political party or candidate). The matrix of possible speakers and the effect the law would have had on them can be described as follows:

(1) Individual who wanted to affirmatively charge a price for the purchase of widgets that convey no message or ideas. This individual would have to apply for and obtain a license before selling his or her widgets. Once the license was granted, he or she could only sell from a designated fixed location. Under no circumstances could he or she sell his or her widgets on the Village Green or solicit money to sell or for any other purpose.

(2) Same as (1) except this time when asked about the price of their widgets, individual in this group responds "whatever you choose to give, be it nothing or some unspecified amount." This person would be able to set up his or her table anywhere in the Town, including on the Village Green.

(3) Individual who runs for office, but who also sells the same widgets sold by (1) and (2). The only difference here is that the widgets now have "Vote for Me" printed on them. This individual could set up a table for the sale of his or her widgets anywhere in the Town including the Village Green.

(4) Same as (3) except now the individual does not want to register as a candidate for office, does not support a particular party, and is not working on behalf of a candidate, yet sells the same widgets as in (3) which state "Vote for Me" for purposes of parody or sarcasm. This person must obtain a license, stay in the designated fixed location, and could not use the Village Green.

(5) Same as (4), only now the individual is associated with a public interest group that is politically active, yet not a political party, and is not affiliated with a particular candidate. This individual also would have to obtain a license and remain in the designated area. He or she could not conduct his or her activities on the Village Green.

(6) Same as (5), only this time the representative of the politically active public interest group merely wants to give things away rather than sell widgets or affirmatively solicit money. This person would not have to obtain a license and could set up anywhere in the Town, including the Village Green.

Thus, there are two groups of individuals who may engage in otherwise unauthorized vending activities without a license and anywhere in town including the Village Green: (a) those who do not affirmatively charge or solicit money for their goods, wares, merchandise, or services and (b) those who are either political candidates, acting in behalf of a political candidate, or acting in behalf of a political party. How Defendant arrived at this classification scheme as one that would minimize any hindrances to pedestrian and vehicular traffic passing through the center of the Town is a mystery to this Court. Setting aside the reasons for these demarcations, one thing that is perspicuous is the prominent position occupied by content and the identity of the speaker in distinguishing between individuals (1)–(6).

This is played out further in the only evidence in the record dealing with the Town Board's intent in drafting the Vending Law. In her deposition, Tracy Kellogg stated that she understood the Vending Law to mean that a political candidate or one associated with a political candidate could solicit funds on the Village Green by, for example, selling bumper stickers because such sales "would be secondary to the uses of the political message that the

individual might be trying to state." Krafchow Aff. Ex. G, Kellogg Dep. at 11. Indeed at the time the Town Board passed the law, Kellogg admitted that "we were anticipating pro-choice, pro-lifers handing out pamphlets. That was what we were anticipating the political use of the Village Green would be." *Id.* Kellogg further claimed that the Town Board discussed whether those who were politically active though not associated with a political party could solicit funds, sell bumper stickers, and the like, and that they concluded after that discussion that such organizations or individuals could put out a "sign that says donations, recommended donation $1, but soliciting would be prohibited on the Village Green." *Id.* at 13–14.

It is clear that the Town Board in fact intended to discriminate between different speakers depending on the message they would convey. More objectionable is the fact that the Town Board went even two steps further: first, to discriminate between the variety of speakers conveying a political message (those affiliated with a candidate or party versus those who were not); and second, to specifically discriminate between speakers on a particular issue (pro-choice activists versus the Right-to–Life party). That is, Kellogg admitted that the Town Board discussed the effect the Vending Law would have on politically active groups who were not affiliated with a party or candidate such as pro-choice activists. Kellogg also stated "[t]he right to life would be a political party." *Id.* at 12. The clear implication is that the Town Board at the time the Vending Law was enacted knew that the Right-to–Life party would be able to solicit funds and sell bumper stickers and other promotional material anywhere in the Town including the Village Green, but that the pro-choice advocates could not solicit funds and could only pass out handbills and rely upon the voluntary donations of others if they wanted to use the Village Green. If they did wish to engage in sales and solicitation, the pro-choice advocates would have to obtain a license and, even then, could not use the Village Green but would be compelled to remain in one location chosen by the licensing authority, i.e., the Town Board.

This raises yet another problem with The Town's Vending Law. Though it allows for the allocation of licenses relative to particular designated areas, there is no indication as to how those areas are selected for any given vendor. A group that the Town Board felt was particularly objectionable could have been effectively silenced by awarding a site rarely visited by a large proportion of the public. Thus, for example, the pro-choice supporters could have been granted a vending license for a designated area far from the Village Green and, more importantly, far from the opportunity to interact with as many people as the Right–to–Life party would have.

■ Though the regulation of solicitation itself is content-neutral, *see Kokinda,* 497 U.S. at 736, 110 S.Ct. 3115 ("It is the inherent nature of solicitation itself, a content-neutral ground, that the Service justifiably relies upon when it concludes that solicitation is disruptive of its business"), there is a sufficient difference between solicitation and sales on the one hand and relying on donations or passing out handbills on the other such that denying one group the ability to solicit funds implicates First Amendment concerns. First of all, "[s]olicitation is a recognized form of speech protected by the First Amendment." *Kokinda,* 497 U.S. at 725, 110 S.Ct. 3115 (citing cases). *See also Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 633, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ("[O]ur cases long have protected speech even though it is in the form of ... a solicitation to pay or contribute money."); *Bates v. State Bar of Arizona,* 433 U.S., at 363, 97 S.Ct. 2691). As the *Schaumburg* Court pointed out,

> [s]oliciting financial support is undoubtedly subject to reasonable regulation but

the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease.... Furthermore, because charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services, it has not been dealt with in our cases as a variety of purely commercial speech.

444 U.S. at 632, 100 S.Ct. 826. *See also Kokinda,* 497 U.S. at 734, 110 S.Ct. 3115 ("One need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand, but one must listen, comprehend, decide, and act in order to respond to a solicitation...."). The fact that the Vending Law permitted one political group to solicit funds and sell various articles while it simultaneously denied that freedom to another is a noticeable difference of constitutional degree.

Given its express text, the clear intention of the Town Board to discriminate between speakers, and the practical implications of the Vending Law, this Court finds that the Vending Law was not a content-neutral restriction on speech.

Because the Vending Law was not content-neutral, it will be deemed valid only if it was narrowly tailored to meet a compelling state interest. *See Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948. The interest that the Town claims was served by the Vending Law was maintaining the convenience of the public and ensuring the orderly flow of both pedestrian and vehicular traffic in and around the center of Town. *See* Krafchow Aff. Ex. H, L.L. # 1/96 ("It is the intent of the Town of Woodstock to assure vending on public property in the Town is conducted in a safe and peaceful manner without undue convenience to Town residents."); *see also id.* ("It is hereby found that to protect both vehicular and pedestrian traffic, particularly in the center of Town, vending on public property shall be conducted only from those locations designated by the Town Board...."). "As a general matter, ... a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron,* 452 U.S. at 650, 101 S.Ct. 2559 (citing *Grayned v. City of Rockford,* 408 U.S., at 115, 92 S.Ct. 2294; *Cox v. New Hampshire,* 312 U.S., at 574, 61 S.Ct. 762). Therefore, the Town's interest in controlling traffic while ensuring the convenience of Town residents is a sufficiently compelling interest to warrant examination of whether the Vending Law was narrowly tailored to serve that interest. This Court finds that it was not.

As a preliminary matter, it is unclear why the Town Board believed that the traffic potentially caused by a political speaker engaging in commercial activities would be less problematic than the traffic caused by a non-political speaker engaging in the same activity. More importantly, it is dubious at best to claim that the traffic generated by the solicitation of an individual affiliated with a political party would somehow be greater than independent political-interest groups. Certainly, the two groups the Town Board had in mind when it drafted the Vending Law, pro-choice and right-to-life, speak to a highly controversial and divisive issue that can polarize a community due to the fact that each side can engender considerable support. Whether either one is affiliated with a political candidate or party, or in fact is a party itself, seems irrelevant relative to considerations of resulting congestion.

To be sure, solicitation can cause a greater impediment to the flow of pedestrian and vehicular traffic than simply handing out handbills.

... I think that common-sense differences between literature distribution, on the one hand, and solicitation and sales, on the other, suggest that the latter activities present greater crowd control problems than the former. The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead, the recipient is free to read the message at a later time. For this reason, literature distribution may present ... fewer crowd control problems than ... oral proselytizing.... In contrast, ... sales and the collection of solicited funds not only require [one] to stop, but also 'engender additional confusion ... because they involve acts of exchanging articles for money, fumbling for and dropping money, making change, etc.' *Heffron,* 452 U.S. at 665, 101 S.Ct. 2559 (Blackmun, J., concurring in part and dissenting in part) (quoting *International Soc'y for Krishna Consciousness v. Heffron,* 299 N.W.2d 79, 87 (Minn.1980), rev'd, *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981)). But the Town submitted no evidence whatsoever to substantiate a claim that solicitation or sales on the Village Green by a political party would generate less traffic than an individual soliciting either for purely commercial reasons or for a political cause other than the benefit of a particular party or candidate. Though the Town notes that Krafchow submitted no such evidence, it is the Town's burden to establish narrow tailoring for the specified compelling interest.

No doubt a plausible argument could be made that the political gatherings of some parties are more likely than others to attract large crowds causing congestion ... or that speakers delivering a particular message are more likely than others to attract an unruly audience.... [But] governments [must] regulate based on actual congestion, visual clutter, or violence rather than based on predictions that speech with a certain content will induce these effects.

*Boos v. Barry,* 485 U.S. at 335, 108 S.Ct. 1157 (Brennan concurring in part and concurring in judgment).

The Town Board instead relied upon common knowledge or experience that the center of the Town had a traffic problem. Though admitting that this problem was exacerbated during the summer months, no provision was made in the Vending Law for seasonal changes in traffic flow. Such experiential knowledge may be sufficient in a "reasonableness" case like *Kokinda,* see 497 U.S. at 735–37, 110 S.Ct. 3115, but seems insufficient in a strict scrutiny case such as the one sub judice.

Furthermore, there were less restrictive alternatives than the manner of regulation prescribed by the Vending Law. In a strict scrutiny case such as this one, it is appropriate for a court to assess whether there are less restrictive alternatives. *Compare Boos v. Barry,* 485 U.S. 312, 326–27, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (finding the law at issue not narrowly tailored because "a less restrictive alternative [was] readily available.") with *Ward v. Rock Against Racism,* 491 U.S. 781, 800 n. 6, 109 S.Ct. 2746, 105 L.Ed.2d 661 (rejecting application of less restrictive alternative test to time, place, or manner cases involving content-neutral regulations but noting its continued force in strict scrutiny cases). Rather than entirely prohibit a group's right to engage in the protected activity of solicitation on the Village Green based on political affiliation, the Town Board could have simply allowed all political speakers access to the same forum. Or, at the very least, it could have made the requisite evidentiary showing as to why the purposes of the law could not have been otherwise attained had such an allowance been made. Thus, the Vending Law was not narrowly tailored for the stated interest.

This Court is mindful of the Supreme Court's concern in *Heffron* that the lower court analyzed the issues with an overly narrow view of the effects on the relevant

forum because it examined the potential limitations on speech relative only to the specific plaintiff. *See Heffron,* 452 U.S. at 654, 101 S.Ct. 2559 (noting that lower court failed to account for the fact that any exemption of the ordinance at issue could not be meaningfully limited to ISKCON); *see also id.* ("As we have indicated, the inquiry must involve not only [plaintiff], but also all other organizations that would be entitled to distribute, sell, or solicit....").  The finding of this Court, however, is not that all individuals or organizations now have a right to engage in sales of solicitation on the Village Green. Indeed, as noted previously, such activities though protected can be regulated.  In this particular case, however, the Town Board failed to enact a regulation that passes constitutional muster.

### B.  Freedom of Religion

The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all governmental regulation of religious beliefs as such....  The government may not compel affirmation of religious belief, ... punish the expression of religious doctrines it believes to be false, ... impose special disabilities on the basis of religious views or religious status, ... or lend its power to one or the other side in controversies over religious authority or dogma.

*Employment Div., Dept. of Human Res. v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the Court set forth the standards according to which courts should determine the constitutionality of a particular law relative to the Free Exercise clause. *See City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (reinstating *Smith* as correct standard by finding Religious Freedom Restoration Act unconstitutional).  As the Court summarized in *City of Boerne,* "*Smith* held that neutral,

generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest."  521 U.S. at 514, 117 S.Ct. 2157.

■ *Smith,* however, went on to distinguish "hybrid" cases, 494 U.S. at 882, 110 S.Ct. 1595, or those involving, for example, a free exercise claim along with a free speech claim.  "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech...." *Id.* at 881, 110 S.Ct. 1595 (citing cases).  The Court noted that *Smith* did "not present such a hybrid situation, but a free exercise claim unconnected with any communicative activity...." *Id.* at 882, 110 S.Ct. 1595.  The implication of the Court's distinction is that in such "hybrid" cases, courts should apply the more exacting standard of review set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).  Under the *Sherbert* test, governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest.  *See id.,* at 402–403, 83 S.Ct. 1790.  As this Court has already noted, *see supra* section A., this in fact is a case involving Krafchow's freedom of speech.  Therefore, as a "hybrid" case, the constitutionality of the Vending Law relative to the Free Exercise Clause must be analyzed under the more exacting *Sherbert* analysis.

■ Krafchow admits that though he did not need to perform card readings in order to practice the Jewish faith, this is the manner in which he has chosen to express his beliefs and to convey a message to his patrons.  He claims he is following a fundamental tenet of the Jewish religion which is to teach others knowledge acquired.  Defendant, however, avers that the readings are not really religious speech or a practice of Krafchow's faith because

he has offered no objective evidence to show that "the use of Tarot cards in this fashion is in some way a recognized way of teaching about the Jewish faith or any type of genuine religious activity." Def.'s Mem. at 2. Though recognizing that Krafchow, "in his own philosophy of life, sees a connection between the Tarot cards and the Torah[,]" *id.*, Defendant claims that this individualistic interpretation does not give rise to a link between the commercial activity and a particularized message. *Id.* (citing *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir.1988)).

Defendant's contentions are instructive. *Farid* addressed a prisoner's freedom of speech and of religion relative to a deck of Tarot cards, books on Tarot, and a cassette tape which were confiscated according to prison mailroom regulations. 850 F.2d at 920. The court noted that in the prison context a regulation impinging upon one's constitutional rights need only be reasonably related to a legitimate penological interest in order for the regulation to be valid. *Id.* at 925. The court held that Farid's freedom of religion claim failed because he "neither alleged nor submitted any proof that he sincerely [held] to any religious belief that mandates the use of Tarot cards...." *Id.* at 926. Therefore, it was not only the absence of a sincerely held belief, but a sincerely held belief in a practice mandated by faith.

Here, Krafchow adheres to a sincerely felt belief that he must teach others the aspect of his faith about which he knows most, the Kabala, and the manner in which he has chosen to teach same is through the use of Tarot cards. Krafchow has never maintained, however, that he must use Tarot as a means of conveying knowledge or as a means of practicing his faith. Preventing Krafchow from performing his card reading services did not, therefore, substantially interfere with his faith as such.

Accordingly, though Krafchow's claim predicated on the Free Exercise Clause fails, based on the fact that the Vending Law improperly impinged upon his freedom of speech, his motion for summary judgment is hereby GRANTED; the Town's motion for summary judgment is hereby DENIED.

After all, if not on the Woodstock Village Green, where is the right to free speech secure?

IT IS SO ORDERED.