**Cheryl BISCHOFF, Vicky Stites, Seth Spangle, Plaintiffs,**

v.

**State of FLORIDA, Robert Butterworth, in his official capacity as Attorney General of the State of Florida, Sheriff Charles C. Aycock, in his Official Capacity, Defendants.**

No. 6:98CV583–ORL–28JGG.

United States District Court, M.D. Florida. Orlando Division.

Jan. 3, 2003.

Brian Fahling, Bryan J. Brown, American Family Association Law Center, Tupelo, MS, Heidi Wolff Isenhardt, Law Office of Heidi Wolff Isenhart, Winter Park, FL, for Cheryl Bischoff, Vicky Stites, Seth Spangle.

D. Andrew DeBevoise, Kathleen Ann Meagher Krak, DeBevoise & Poulton, P.A., Winter Park, FL, for Charles C. Aycock.

Alison L. Becker, Office of the Attorney General, Civil Litigation Div., Tampa, FL, Jeffrey F. Mahl, Attorney General's Office, West Palm Beach, FL, for Robert A. Butterworth.

Alison L. Becker, Office of the Attorney General, Civil Litigation Div., Tampa, FL, Jeffrey F. Mahl, Attorney General's Office, West Palm Beach, FL, for State of Florida.

### ORDER

ANTOON, District Judge.

This cause is before the Court on Defendant Sheriff Aycock's Motion to Dismiss against Plaintiffs Cheryl Bischoff, Vicky Stites and Seth Spangle (Doc. 79, filed

January 9, 2002); and Defendant Robert Butterworth's ("Mr. Butterworth") Motion to Dismiss against Plaintiffs. (Doc. 81, filed January 29, 2002). The United States Magistrate Judge has submitted a Report and Recommendation (Doc. 100, filed September 19, 2002) providing that both Defendant Aycock's and Defendant Butterworth's Motion to Dismiss against Plaintiff be denied.

After an independent review of the record in this matter, including the Objections filed by all Defendants (Doc. 102, filed October 3, 2002 and Doc. 103, filed October 7, 2002) and the response filed by Plaintiffs (Doc. 105 filed October 22, 2002), the Court agrees with the findings of fact and conclusions of law in the Report and Recommendation.

## I. *Procedural History*

On December 29, 1997 religious activists gathered at the heavily trafficked intersection of Irlo Bronson Memorial Highway and Old Vineland Road in Osceola County, Florida for a demonstration. The activists were protesting Walt Disney's alleged support of homosexuality. The demonstrators carried signs and distributed handbills that articulated their criticism of Walt Disney's policies. In response to the demonstration, the Osceola County Sheriff's Deputies arrested three of the protesters, Phillip Benham ("Mr. Benham"), Matthew Bowman ("Mr. Bowman") and Seth Spangle ("Mr. Spangle"). They were each charged with violating section 316.2045(2), Florida Statutes, for obstruction of traffic without a permit and section 316.2055 for throwing advertising material into vehicles.

Cheryl Bischoff ("Ms. Bischoff") and Vicky Stites ("Ms. Stites") were among the activists protesting against Walt Disney.

On May 18, 1998 both Ms. Bischoff and Ms. Stites filed the instant action alleging that sections 316.2045 and 316.2055 were unconstitutional, both on their face and as applied to Plaintiffs.

Initially, this case was assigned to the Honorable Judge G. Kendall Sharp who dismissed the entire case because the Plaintiffs could not establish that they suffered an actual or threatened injury and therefore did not have standing to bring an as-applied challenge to the statute. With regard to the facial challenges, Judge Sharp declared the contested Florida Statutes constitutional and denied all outstanding motions as moot. (Doc. 48). However, on appeal the Eleventh Circuit reversed and remanded Judge Sharp's decision, ordering this court "to either hold an evidentiary hearing on the issue of standing or consider the merits of Plaintiff's as applied challenge." *Bischoff v. Osceola County, Fla.*, 222 F.3d 874, 876 (11th Cir.2000). According to the Eleventh Circuit, "the court erred in making findings of disputed facts and judgments regarding credibility, on which it then based its standing conclusion, without holding an evidentiary hearing." *Bischoff*, 222 F.3d at 885. Upon remand from the court of appeals, the case was reassigned to the undersigned United States district judge.

On February 7, 2001 Robert Butterworth ("Mr. Butterworth"), the Attorney General of the State of Florida, intervened as a Defendant (Doc. 60) and in late August Osceola County was dismissed from the case pursuant to agreement of the parties. (Doc. 72). A second amended complaint was filed on December 20, 2001 which added Mr. Spangle as a Plaintiff and substituted Sheriff Aycock for Sheriff Croft as a Defendant. (Doc. 76). Defendants filed a motion to dismiss the second

amended complaint (Docs. 79 & 81) to which Plaintiffs responded in opposition. (Docs. 80 & 82). In addition, the Plaintiffs filed a motion to set their facial challenge for summary judgment briefing. (Doc. 82).

This court referred these motions to Magistrate Judge James G. Glazebrook for a Report and Recommendation. Since the parties offered evidence outside the pleadings, on August 2, 2002 the Magistrate Judge converted the motions to dismiss to motions for summary judgment. An evidentiary hearing was held on August 27, 2002 on the issue of standing as well as on the facial challenges to sections 316.2045 and 316.2055. At oral argument the parties conceded that Plaintiffs' as-applied challenges were not ripe for summary judgment and that no sovereign immunity or qualified immunity issues remained. (Doc. 98 at 283–89). A Report and Recommendation was filed by Magistrate Judge Glazebrook on September 19, 2002 recommending denial of defendant's motions to dismiss and further recommending that Plaintiffs be found to have standing to pursue their First Amendment challenges to sections 316.2045 and 316.2055. Most significantly, the Magistrate Judge recommended that the relevant statutes be found facially unconstitutional and declared invalid. The Defendants subsequently filed objections to the Report and Recommendation (Docs. 102 & 103) and the Plaintiffs filed a response (Doc. 105).

## II. *Defendants' Objections*

### A. *The arrest of three protesters caused the termination of the demonstration.*

The Defendants object to the Magistrate Judge's use of the word "disbanded" in the following sentence: "On December 29, 1997, the Osceola County Sheriff's Office *disbanded* an organized protest at the heavily-trafficked intersection of Irlo Bronson Memorial Highway and Old Vineland Road in unincorporated Osceola County, Florida." (Doc. 100 at 2) (emphasis added). According to the Defendants, the use of the word "disbanded" can be interpreted to mean that Sheriff's officers told or instructed protestors to leave the demonstration. The Defendants argue that there is no evidence in the record to suggest that any officer instructed a protestor to leave the area. Defendants however, do concede that the arrest of three of the protestors did result in the departure of other demonstrators. (Doc. 102 at 9).

The Court does not interpret the word "disbanded" in the Report and Recommendation to mean that the Sheriff's officers instructed the activists to leave the demonstration. However, the Court does interpret the Report and Recommendation to read that the December 29, 1997 demonstration was essentially disbanded by the arrest of three religious activists. Upon witnessing the arrest of three protesters the remaining activists feared the possibility of their own arrest and thus refrained from exercising their First Amendment right. The Magistrate Judge's Report and Recommendation does not in any way suggest that the Sheriff's officers instructed any demonstrators to leave. In fact, the Magistrate Judge explains that "Plaintiffs presented no evidence demonstrating that any Osceola County Deputy Sheriffs acted unprofessionally or in a manner inconsistent with their difficult responsibility of enforcing thousands of state and federal statutes." (Doc. 100 at 18 n. 8) Moreover, the interpretation of the word "disbanded" has no significance in the legal analysis of this case. This Court finds the use of the

word "disbanded" in the Report and Recommendation to be proper and agrees with the Magistrate Judge's finding of fact.

B. *The parties conceded at oral argument that no sovereign immunity or qualified immunity issues remained.*

The State of Florida and Mr. Butterworth object to the Magistrate Judge's finding that Defendants conceded that there are no issues as to sovereign immunity or qualified immunity remaining in the case.[1] It is clear from the transcript of the hearing that all Parties agreed that no sovereign immunity or qualified immunity issues remained:

| | |
|---|---|
| The Court: | Does the State of Florida say that it could pass any statute no matter how strongly in violation of the U.S. Constitution and there could be no suit in federal court, but that the only federal review can occur after a full exhaustion of state remedies through the Florida Supreme Court and on the chance that the U.S. Supreme Court grants cert? |
| Ms. Becker [2]: | We understand that we have an obligation to defend the statute? … So I was using this primarily to narrow the scope so that everybody understands the State of Florida and Attorney General are only in this case to defend that statute, but that if this broadens out to anything beyond that, that we can't be sued beyond that. |
| The Court: | So you don't contest that the State of Florida can be sued in federal court to determine the federal constitutionality of statutes in a declaratory judgment context? |
| Ms. Becker: | To the best of my knowledge, yes, your Honor, that's, yes, the state can come in for those purposes. |
| The Court: | And it doesn't impair that there are nominal damages sought. |

| | |
|---|---|
| Ms. Becker: | Well, the nominal damages cannot be sought against the state is what I'm getting at. So in other words, we can defend the statute, but that's it. |

(Doc. 98 at 286–87). The Court then proceeded to inquire about qualified immunity:

| | |
|---|---|
| The Court: | All right. So there's really no issue as to sovereign immunity. And as to qualified immunity in that it's a declaratory judgment action, Attorney General's position. |
| Ms. Becker: | Your Honor, we didn't raise qualified immunity. |
| The Court: | Did the Sheriff raise that? |
| Mr. Poulton: | I don't think so. |
| The Court: | I'm sorry. That's not an issue. |

(Doc. 98 at 287). The parties clearly conceded at oral argument that there were no sovereign or qualified immunity issues to be settled during oral argument. Therefore, the Magistrate · Judge's conclusion with regard to these issues in the Report and Recommendation is proper and adopted by this Court.

C. *The Magistrate Judge properly converted the Defendants' Motions to Dismiss to Motions for Summary Judgment.*

The State of Florida and Mr. Butterworth also object to the Magistrate Judge's conversion of their motion to dismiss to a motion for summary judgment. (Doc. 103 at 12). Typically a court converts a motion to dismiss to a motion for summary judgment when the moving parties ask the court to resolve issues and consider evidence that are beyond the complaint. Federal Rule of Civil Proce-

1. Defendant Sheriff Aycock states in his Objection that "[t]he parties conceded at oral argument that Plaintiffs' as applied challenges were not ripe for summary judgment, and that no sovereign immunity or qualified im-

munity issues remained or existed." (Doc. 102 at 6).

2. Ms. Becker is counsel for Defendants the State of Florida and Mr. Butterworth.

dure 12(b) gives a court discretion to treat a motion to dismiss for failure to state a claim as a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. However, upon conversion of a motion to dismiss to a motion for summary judgment "[n]otice must be given to each party that the status of the action is now changed, and they must be given a 'reasonable opportunity' to present legal and factual material in support of or in opposition to the motion for summary judgment." *U.S. v. Gottlieb,* 424 F.Supp. 417, 418 (S.D.Fla.1976) (quoting *Sims v. Mercy Hosp.,* 451 F.2d 171 (6th Cir.1971)). "It is well established in this circuit that the ten day notice requirement of FED. R. CIV. P. 56(c) is strictly enforced." *Herron v. Beck,* 693 F.2d 125 (11th Cir.1982) (citations and footnote omitted). Federal Rule of Civil Procedure 56(c) reads "[t]he motion [for summary judgment] shall be served at least 10 days before the time fixed for the hearing."

On August 2, 2002 the Magistrate Judge issued an Amended Order and Notice of Hearing which notified the parties of the court's conversion of Defendants' motions to dismiss to motions for summary judgment. (Doc. 87, filed August 2, 2002). The Magistrate Judge provided that "[o]n or before August 22, 2002, either party (or the intervener) may also file additional affidavits and exhibits within the purview of FED. R. CIV. P. 56 as to matters that remain contested—as well as a Notice of Supplemental Authorities with explanatory parentheticals—in support of or in opposition to the motions." (Doc. 87 at 3). The Magistrate Judge further explained that "[t]he Court will hear oral argument on

the motions, as well as any necessary evidence not otherwise presented (to the extent required by law), on Tuesday, August 27, 2002 at 9:30 a.m." (Doc. 87 at 3–4).

The parties were notified twenty-five days prior to the evidentiary hearing of the court's conversion of the pending motions to dismiss to motions for summary judgment. This notice was well within the ten-day requirement and certainly provided the parties with a reasonable opportunity to present legal and factual material in support of or in opposition to the motions for summary judgment. The conversion of the motions in this instance was proper and complied with the notice requirement of Federal Rule of Civil Procedure 56(c).

### D. *The Plaintiffs have standing to bring their claims.*

■ The State of Florida and Mr. Butterworth object to the Magistrate Judge's recommendation that Ms. Bischoff and Ms. Stites have standing to bring their claim.[3] The State of Florida and Mr. Butterworth argue that Ms. Bischoff and Ms. Stites do not have standing because they were not arrested during the demonstration and have not suffered an injury.

The Supreme Court in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), articulated the necessary requirements a Plaintiff must show to establish standing:

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connec-

---

**3.** The "Defendant Sheriff in [his] Objection does not object to Magistrate Judge Glazebrook's ruling that the Plaintiffs have stand-

ing to bring their claims." (Doc. 102 at 8). All Defendants, however, concede that Mr. Spangle has standing to bring suit.

tion between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision.

504 U.S. at 560–561, 112 S.Ct. 2130 (internal marks and citations, and footnote omitted). The Court further explained that "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561, 112 S.Ct. 2130 (quoting *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)).

Ms. Bischoff and Ms. Stites satisfy each of the constitutional requirements to establish standing. First, the fact that they were threatened with arrest for engaging in a demonstration is proof of a concrete injury to meet the "injury in fact" requirement. *See Bischoff,* 222 F.3d at 884 (explaining that the threat of arrest is wholly adequate to show injury in fact to establish standing). As noted by the Magistrate Judge, the threat of arrest was not limited to only those protesters engaged in particular activities. "First, the threat of arrest was not limited to those who stepped in the road—or at least no such limit was proved a the hearing. Sheriff Aycock himself argued in his brief that protestors who did not go into the street, but merely approached vehicles to solicit, nevertheless violated Florida law" and were thus subject to arrest. (Doc. 100 at 19–20). The threat of arrest in this instance was actual and concrete rather than merely conjectural or hypothetical. Ms. Bischoff and Ms. Stites refrained from exercising their First Amendment rights in order to avoid arrest. Thus, they suffered an injury in fact.

Second, Ms. Bischoff and Ms. Stites have established a causal link between the injury they suffered and Sheriff Aycock's enforcement of the contested statutes. "[B]oth Bischoff and Stites were engaged in conduct violative of the same Florida laws for which Osceola County Sheriff's Deputies arrested Plaintiff Spangle." (Doc. 100 at 20).

Finally, it is more than likely, not merely speculative, that Plaintiffs' injury would be redressed by a facial invalidation of the contested statutes. Defendants' primary argument in their objection to the Report and Recommendation with regard to the issue of standing focuses on the fact that neither Ms. Bischoff or Ms. Stites stepped in the road during the demonstration and were not arrested. The Defendants' Objection to the Report and Recommendation does not refer to any other factual evidence or case law that would bolster Defendant's position. As a result, this Court agrees with the Magistrate Judge's conclusion that all the Plaintiffs have standing to contest the constitutionality of sections 316.2045 and 316.2055.

E. *The Magistrate Judge properly reconsidered the Plaintiffs' facial challenge to the contested Florida statutes.*

■ In the Defendants' Objections to the Magistrate's Report and Recommendation (Docs. 102 & 103), the Defendants essentially argue that in revisiting the facial challenges to the relevant Florida statutes the Magistrate Judge violated the law of the case doctrine that requires trial courts to strictly adhere to the mandates of appellate courts. *See Piambino v. Bailey,* 757 F.2d 1112, 1120 (11th Cir.1985) (explaining that a "trial court, upon receiving the mandate of an appellate court, may

not alter, amend, or examine the mandate, or give any further relief or review, but must enter an order in strict compliance with the mandate"). The law of the case "doctrine stands for the proposition that an appellate decision on an issue must be followed in all subsequent trial court proceedings unless the presentation of new evidence or an intervening change in the controlling law dictates a different result, or the appellate decision is clearly erroneous and, if implemented, would work a manifest injustice." *Id.* (citing *Westbrook v. Zant,* 743 F.2d 764, 768–69 (11th Cir. 1984)).

According to the Defendants, the disturbance of Judge Sharp's initial finding that the relevant Florida statutes were constitutional is against the Eleventh Circuit's August 14, 2000 mandate remanding the case "to the district court either to hold an evidentiary hearing on the question of standing or to rule on the merits of Plaintiffs' as applied challenge as raised in the parties' cross motion for summary judgment. *We refrain from reviewing the district court's ruling on the merits of Plaintiff's facial challenge at this time.*" *Bischoff v. Osceola County, Fla.,* 222 F.3d 874, 886 (11th Cir.2000) (emphasis added). The Defendants argue that the Eleventh Circuit reversed and remanded Judge Sharp's decision only for the District Court to reconsider standing or the Plaintiffs' as-applied challenge, not to reconsider Judge Sharp's conclusion with regard to the facial challenge. The hearing on the facial challenge along with the subsequent recommendation is, in the perspective of the Defendants, a violation of the Eleventh Circuit's instructions.

■ The policy behind the law of the case doctrine is to maintain a sense of efficiency, finality and obedience within the judiciary. *See Litman v. Mass., Mutual Life Ins. Co.,* 825 F.2d 1506, 1511 (11th Cir.1987) (explaining that judicial dispute resolution must have elements of finality and stability). " 'Judicial precedence serves as the foundation of our federal judicial system. Adherence to it results in stability and predictability.' " *Id.* at 1510 (citing *Jaffree v. Wallace,* 705 F.2d 1526, 1533 (11th Cir.1983)). "[I]t would be impossible for an appellate court 'to perform its duties satisfactorily and efficiently' and 'expeditiously if a question, once considered and decided by it were to be litigated anew in the same case upon any and every subsequent appeal' thereof." *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 19 (5th Cir.1974) (quoting *White v. Murtha,* 377 F.2d 428, 431 (5th Cir. 1967)). In other words, the law of the case doctrine is primarily concerned with the duty of lower courts to follow what has already been decided in a case. It does not, however, extend to issues the appellate court does not address. *See Piambino,* 757 F.2d at 1120 (explaining that the "law of the case doctrine applies to all issues decided expressly or by necessary implication; it does not extend to issues the appellate court did not address."); *see also Terrell,* 494 F.2d at 19 (explaining that the law of the case rule applies only to issues that were decided, and does not include determination of questions which might have been decided). Therefore, a lower court would not violate the law of the case doctrine in deciding an issue that an appellate court did not address in a previous decision.

The law of the case doctrine simply does not extend to the Plaintiffs' facial challenge to the statutes because the Eleventh Circuit did not decide the issue. The Eleventh Circuit clearly stated that "[w]e refrain from reviewing the district court's

ruling on the merits of the Plaintiff's facial challenge at this time." *Bischoff,* 222 F.3d at 886. In re-examining the facial challenge, the Magistrate Judge did not exceed his authority but merely reconsidered an issue the Eleventh Circuit did not address. Moreover, the Magistrate Judge issued an Order on August 15, 2002 providing the parties with specific issues that they had to address during oral argument in order to ensure that all parties were prepared to address the question of facial constitutionality. (Doc. 88). In sum, the reconsideration of the facial challenge was appropriate and not a violation of the law of the case doctrine because the Eleventh Circuit decision did not require that Judge Sharp's ruling remain undisturbed.

F. *The contested Florida statutes are unconstitutional.*

1. *Section 316.2045 is unconstitutional because it is content-based and vague.*

■ All the Defendants object to the Magistrate Judge's recommendation that section 316.2045 be declared unconstitutional.[4] The Magistrate Judge's recommendation is premised on the legal theory that section 316.2045 is content-based and vague. According to the Magistrate Judge, "the Florida statute facially prefers the viewpoints expressed by registered charities and political campaigners by allowing ubiquitous and free dissemination of their views, but restricts discussion of all other issues and subjects." (Doc. 100 at 31).

The Supreme Court in *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), similarly dealt with an Illinois statute that made distinctions between peaceful picketing and peaceful labor picketing. The contested Illinois statute prohibited picketing on public streets and sidewalks in residential neighborhoods, but made an exception for peaceful labor picketing. The Supreme Court in *Carey* explained:

> The central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject mat-

---

4. Section 316.2045 states:
 (1) It is unlawful for any person or persons willfully to obstruct the free, convenient and normal use of any public street, highway or road by impeding, hindering, stifling, retarding, or restraining traffic or passage thereon, by standing or approaching motor vehicles thereon, or by endangering the safe movement of vehicles or pedestrians traveling thereon; and any person or persons who violate the provisions of this subsection, upon conviction, shall be cited for a pedestrian violation, punishable as provided in chapter 318.
 (2) It is unlawful, without proper authorization or a lawful permit, for any person or persons willfully to obstruct the free, convenient, and normal use of any public street, highway, or road by any of the means specified in subsection (1) in order to solicit. Any person who violates the

provisions of this subsection is guilty of a misdemeanor of the second degree, punishable as provided in § 775.082 or § 775.083. Organizations qualified under § 501(c)(3) of the Internal Revenue Code and registered pursuant to chapter 496, or persons acting on their behalf are exempted from the provisions of this subsection by the state. Permits for the use of any portion of a state-maintained road or right-of-way shall be required only for those purposes and in the manner set out in § 337.406.
 (3) Permits for the use of any street, road or right-of-way not maintained by the state may be issued by the appropriate local government.
 (4) Nothing in this section shall be construed to inhibit political campaigning on the public right-of-way or to require a permit for such activity.

ter.... Any restriction on expressive activity because of its content would completely undercut the profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open.

*Id.* at 462–63, 100 S.Ct. 2286 (internal citations and footnote omitted). The Court further explains in *Carey* that "[t]here is an equality of status in the field of ideas, and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say." *Id.* at 463, 100 S.Ct. 2286 (internal citations and footnote omitted). The Court in *Carey* found the Illinois statute unconstitutional under the Equal Protection Clause of the Fourteenth Amendment because it made an impermissible subject matter distinction between lawful and unlawful picketing.

The Florida statute is similar to the Illinois statute at issue in *Carey.* The Florida statute suffers from the same constitutional infirmities. Facially the Florida statute prefers speech by § 501(c)(3) charities and those who are engaged in political speech. The Defendants in their objection to the Magistrate Judge's recommendation cite only to Judge Sharp's previous decision finding the contested Florida statute constitutional. The Defendants do not engage in any further analysis or cite to any other legal authority to support their position. In light of the impermissible distinctions made in section 316.2045, Florida Statutes, the Court finds the statute unconstitutional under the Equal Protection Clause of the Fourteenth Amendment and the First Amendment of the United States Constitution.

The Magistrate Judge also found section 316.2045 void for vagueness. "The essential purpose of the 'void for vagueness' doctrine is to warn individuals of the criminal consequences of their conduct." *Jordan v. De George,* 341 U.S. 223, 230, 71 S.Ct. 703, 95 L.Ed. 886 (1951) (quoting *Williams v. United States,* 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951)). "The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Id.* at 231–2, 71 S.Ct. 576.

Section one of the contested statute in this case contains several ambiguous terms which make it difficult for an individual to determine what type of conduct is unlawful. "Section one is ambiguous as to whether it is unlawful for an individual to willfully obstruct the free use of the road 'by standing,' or whether she must do so by standing on the road. The undefined terms 'solicit' and 'political campaigning' contribute to the indefiniteness of § 316.2045, as does section two's reference to and partial incorporation of the opaque and undecipherable permit provisions of another criminal statute, § 337.406." (Doc. 100 at 32). The language of section 316.2045 simply does not convey sufficiently definite warning as to the unlawful conduct when measured by common understanding. In the Defendants' Objections to the facial challenge they do not address the ambiguity of the statute. Therefore, this Court shall adopt the Magistrate Judge's recommendation that section 316.2045, Florida Statutes, is void for vagueness.

2. *Section 316.2045 is not narrowly tailored to meet compelling state interest, but rather it is overbroad.*

■ Generally, overbroad statutes have the potential to chill speech. Statutes or

regulations may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Courts invalidate overly broad statutes because "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).

The purpose behind the contested statutes is to ensure public safety on roads, which is a compelling government interest. However, the statute is not narrowly tailored to meet that compelling interest. "Nothing in the § 316.2045's content based charity—non-charity distinction or political nonpolitical distinction has any bearing whatsoever on road safety or uniformity." (Doc. 100 at 34). "Traffic accidents or backups caused by political campaigners or duly licensed charitable organizations are no less problematic than traffic accidents or backups caused by other political speakers or non-licensed charitable organizations." (Doc. 100 at 34). The Defendants argue in their objections that the statute is narrowly tailored and that it provides alternative channels for communication because individuals may apply for a permit in order to express their views. (Doc. 102 at 12). However, the Defendants do not address the Magistrate Judge's conclusion that the statute's permit scheme serves as a prior restraint on speech. "A prior restraint on expression exists when the government can deny access to a forum for expression before the expression occurs." *United States v. Frandsen*, 212 F.3d 1231,

1236–37 (2000). "Although prior restraints are not per se unconstitutional, there is a strong presumption against their constitutionality." *Id.* at 1237. In order for a regulation that places a restraint on speech to pass constitutional muster it must contain procedural safeguards to avoid censorship.

In this instance,

[t]he permitting scheme established by § 316.2045 lacks the procedural safeguards necessary to ensure against undue suppression of protected speech. Neither this court, nor any citizen wishing to engage in legal speech on a Florida road, can determine whether a particular permitting procedure applies to a given stretch of road; whether a particular agency or person has been designated to accept and grant or deny applications; whether any substantive constraints are placed on that person's discretion to deny a license; whether prompt judicial review is available for a denial; and whether there is any time constraint on the issuance or denial of a license.

(Doc. 100 at 36). Although the Defendants argue that individuals could potentially apply for a permit, they do not point to anything in the record that convinces this Court that there are procedural safeguards in place to prevent the undue suppression of speech. Therefore, the Court adopts the recommendation that section 316.2045 is overbroad and not narrowly tailored to meet the government's compelling interest.

3. *Section 316.2055 is not narrowly tailored to meet a significant state interest.*[5]

 Although section 316.2055 is content neutral, it suppresses more speech

---

**5.** Section 316.2055 states:

It is unlawful for any person on a public street, highway, or sidewalk in the state to

than is necessary to serve the stated government purpose of ensuring public safety on roads. In addition, it is impermissibly vague in that it fails to define the terms "advertising or soliciting materials" and thus does not provide sufficient warning as to what conduct is proscribed by the law. The Defendants do not specifically address the Magistrate Judge's legal analysis with regard to the constitutionality of section 316.2055. They do not offer any legal precedent that reaches a contrary conclusion or any factual evidence that persuades the Court to disagree with the Magistrate Judge's recommendation. Therefore, the Court agrees with the Magistrate Judge with regard to the unconstitutionality of section 316.2055.

III. Conclusion

Therefore, it is ORDERED as follows:

1. The Report and Recommendation (Doc. 100, filed September 19, 2002) is **ADOPTED AND CONFIRMED** and made part of this Order.

2. Defendant Aycock's Motion to Dismiss (Doc. 79, filed January 9, 2002) is **DENIED**.

3. Defendant Butterworth's Motion to Dismiss (Doc. 81, filed January 29, 2002) is **DENIED**.

4. It is further Ordered that the Court finds that Plaintiffs have standing to

pursue their constitutional challenges to sections 316.2045 and 316.2055, Florida Statutes.

5. It is further Ordered that sections 316.2045 and 316.2055, Florida Statutes are found facially unconstitutional and invalid.

## REPORT AND RECOMMENDATION

GLAZEBROOK, United States Magistrate Judge.

This cause came on for hearing on August 27, 2002 on the parties' motions for summary judgment. Those motions are:

1) Defendant Sheriff Charles Aycock's ("Sheriff Aycock's") Motion to Dismiss [1] against Plaintiffs Cheryl Bischoff ("Bischoff"), Vicky Stites ("Stites") and Seth Spangle [2] ("Spangle," collectively, "Plaintiffs"); Docket No. 79, filed January 9, 2002; and

2) Defendant Robert Butterworth's ("Butterworth's" or "the Attorney General's," with Aycock, "Defendants' ") Motion to Dismiss against Plaintiffs. Docket No. 81, filed January 29, 2002.

## I. INTRODUCTION

On December 29, 1997, the Osceola County Sheriff's Office disbanded an organized protest at the heavily-trafficked

---

throw into, or attempt to throw into, any motor vehicle, or offer, or attempt to offer, to any occupant of any motor vehicle, whether standing or moving, or to place or throw into any motor vehicle any advertising or soliciting materials or to cause or secure any person or persons to do any one of such unlawful acts.

1. The Court converted Defendants' motions to dismiss to motions for summary judgment pursuant to Federal Rule of Civil Procedure 12(b)(6) because the parties presented matters

outside the pleadings. Docket 87. The Court denied Plaintiffs' motion to set facial challenges for summary judgment to the extent it was inconsistent with this order. *Id.*

2. Plaintiff Seth Spangle was formerly known as Seth Marchke. He is referred to as Marchke in arrest reports, Spangle in pending motions, and both Marchke and Spangle at oral argument.

intersection of Irlo Bronson Memorial Highway and Old Vineland Road in unincorporated Osceola County, Florida. The group had gathered at the intersection to protest Walt Disney World's purported support of homosexuality. The Osceola County Sheriff's Deputies arrested three of the protesters, Phillip Benham ("Benham"), Matthew Bowman ("Bowman") and Spangle. The Sheriff's Office charged them with violating Fla. Stat. §§ 316.2045(2) (obstruction of traffic to solicit without a permit) and 316.2055 (throwing advertising material into vehicles). Benham, Bowman, and Spangle later pled no contest to obstructing traffic to solicit without a permit, and each paid a $25 fine. Plaintiffs Bischoff and Stites were among the remaining protesters. Bischoff and Stites say that they were threatened with arrest under the same statutes, but that they disbanded in order to avoid arrest.

Bischoff and Stites filed this case on May 18, 1998, asking this Court to declare that Fla. Stat. §§ 316.2045 and 316.2055 were unconstitutional, both on their face and as applied to plaintiffs. The case was assigned to The Honorable G. Kendall Sharp. The original complaint named Osceola County as the sole defendant. Plaintiffs later amended their complaint, adding Osceola County Sheriff Charles Croft. Docket 17. Osceola County and Sheriff Croft moved to dismiss the amended complaint. Docket Nos. 19, 22. Sheriff Croft's motion to dismiss alternatively sought summary judgment. Bischoff and Stites filed a cross-motion for summary judgment, Docket No. 29, to which Osceola County and Sheriff Croft responded. Docket Nos. 34, 38.

On February 2, 1999, Judge Sharp dismissed the entire case for lack of standing, and denied all outstanding motions as moot. Docket No. 48. The United States Court of Appeals for the Eleventh Circuit reversed and remanded "to either hold an evidentiary hearing on the issue of standing or consider the merits of Plaintiffs' as applied challenge." *Bischoff v. Osceola County, Fla.,* 222 F.3d 874, 876 (11th Cir. 2000). The Eleventh Circuit held that Judge Sharp had properly raised the issue of standing *sua sponte,* but had improperly decided standing based on contested facts without a hearing. *Id.* Upon remand from the court of appeals, Judge Sharp ordered the Clerk to reassign the case. The Clerk subsequently reassigned the case to The Honorable John Antoon II.

Robert Butterworth, Attorney General of the State of Florida, intervened as a defendant on February 7, 2001. Docket No. 60. By joint stipulation, the parties dismissed Osceola County on August 23, 2001. Docket No. 72. Bischoff and Stites filed a second amended complaint on December 20, 2001, adding Spangle as a plaintiff, and substituting Sheriff Charles Aycock for Sheriff Croft as a defendant. Docket No. 76. Defendants then moved to dismiss Plaintiffs' second amended complaint, Docket Nos. 79, 81, to which Plaintiffs responded in opposition. Docket Nos. 80, 82. Plaintiffs also filed a motion to set their facial challenge to the two statutes for summary judgment briefing. Docket No. 82.

On June 24, 2002, Judge Antoon referred these motions to the undersigned for preparation of a report and recommendation. Because the parties presented to the Court matters outside the pleadings, the Court converted the outstanding motions to dismiss to motions for summary judgment under Fed.R.Civ.P. 12(b), and established a schedule for hearing and re-

solving all pending motions. Docket No. 87.

The Court held an evidentiary hearing on the standing issue on August 27, 2002, and also entertained extensive oral argument on the facial challenges to Fla. Stat. §§ 316.2045 and Fla. Stat. § 316.2055. The parties conceded at oral argument that Plaintiffs' as applied challenges were not ripe for summary judgment, and that no sovereign immunity or qualified immunity issues remained or existed. Therefore, the Court addresses only standing and facial validity.

## II. *THE LAW*

### A. THE STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits, and to move for summary judgment on the case as a whole or on any claim. *Id.* When a moving party has dis-

charged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir.1989). The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988) (internal citations omitted).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

## B. THE LAW OF STANDING

Unless a plaintiff has standing to bring her claims, the Court is without jurisdiction to hear her case. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The party invoking federal jurisdiction bears the burden of proving standing. *Bischoff v. Osceola County, Fla.,* 222 F.3d 874, 878 (11th Cir. 2000), citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To satisfy constitutional standing requirements, a plaintiff must show three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal relationship between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely as opposed to merely speculative that the injury will be redressed by favorable decision.

222 F.3d at 883, citing *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130 (internal marks, citations, and footnote omitted).

## C. FACIAL CHALLENGES UNDER THE CONSTITUTION

### 1. *The United States Constitution*

The First Amendment guarantees that "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const., amend. I. Although the First Amendment is directed at the federal government's conduct, the rights guaranteed by the First Amendment apply with equal force to state governments through the due process clause of the Fourteenth Amendment. U.S. Const., amend. XIV ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

Federal courts are courts of limited jurisdiction. The courts do not reach out to reform or rewrite state statutes that seem to require some improvement. Neither do the federal courts strike down valid laws of which they disapprove. It is the state legislature's duty to enact valid laws, and the Court's duty to declare what the law is, and how the law applies to the facts. The federal courts do not substitute laws that they prefer for the will of the elected state legislature. But where parties in a controversy ask a federal court to declare whether a state law violates the Constitution of the United States, the Court must not shrink from its duty to adjudicate the question presented.

### 2. *The Standards of Constitutional Scrutiny*

#### a. **Forum Analysis**

When a state regulation restricts the use of government property as a forum for expression, a court must first determine the nature of the government property

involved. *United States v. Kokinda,* 497 U.S. 720, 726–27, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). The nature of the property determines the level of constitutional scrutiny applied to the restrictions on expression. *Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). The Supreme Court has delineated three categories of government-owned property for First Amendment purposes: the traditional public forum, the designated public forum, and the nonpublic forum. *Crowder v. Housing Authority of Atlanta,* 990 F.2d 586, 590 (11th Cir.1993).

Streets and parks are the quintessential traditional public fora, because those areas "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (*quoting Hague v. Committee for Indus. Org.,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)); *see also Int'l Soc. for Krishna Consciousness, Inc., v. Lee,* 505 U.S. 672, 696, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (Kennedy, J., concurring) ("At the heart of our jurisprudence lies the principal that in a free nation citizens must have the right to gather and speak with other persons in public places. The recognition that certain government owned property is a public forum provides open notice to citizens that their freedoms may be exercised there without fear of a censorial government,

adding tangible reinforcement to the idea that we are a free people"); *Redd v. City of Enterprise,* 140 F.3d 1378, 1383 (11th Cir.1998) (where traveling minister was arrested for disorderly conduct for preaching on the corner of a busy intersection, streets were a traditional public forum).

### b. Content–Neutral versus Content–Based

■ Courts apply different levels of scrutiny to contested statutes. At issue in the instant case is whether Fla. Stat. §§ 316.2045 and 316.2055 impose only content-neutral restrictions, or whether the restrictions are content-based. In any event, the Court interprets[3] statutes to avoid constitutional difficulties. *Frisby v. Schultz,* 487 U.S. 474, 483, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

### i. Content–Neutral Restrictions

■ In public fora, the government may regulate the time, place and manner of expression so long as the restrictions are: 1) content-neutral; 2) narrowly tailored to serve a significant government interest; and 3) leave open alternative channels of communication. *United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). Content-neutral regulations are those that are "justified without reference to the content of the regulated speech." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). A valid time, place and manner restriction must also be

---

**3.** The Court looks primarily to the language of the statute, and also to the record. The Court's reading or construction of an ordinance, however, may find support in the representation of town counsel at oral argument. *See Frisby v. Schultz,* 487 U.S. 474, 483, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (majority opinion by Justice O'Connor); *but cf.,* 487 U.S. at 493 n. 3, 108 S.Ct. 2495 (questioned in Justice Brennan's dissent because town counsel's interpretations did not bind the state courts).

narrowly tailored to serve a significant government interest. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The government's interest in protecting the safety of persons using a public forum is a valid government objective. *See Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,* 452 U.S. 640, 650, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), *citing Grayned,* 408 U.S. at 109, 92 S.Ct. 2294; *see also News and Sun–Sentinel Co. v. Cox,* 702 F.Supp. 891, 900 (S.D.Fla.1988) ("It requires neither towering intellect nor an expensive 'expert' study to conclude that mixing pedestrians and temporarily stopped motor vehicles in the same space at the same time is dangerous."). The Supreme Court has held, however, that an ordinance may not prohibit "a person rightfully on a public street from handing literature to one willing to receive it" because the defendant has an interest in keeping its streets clean and of good appearance. *Schneider v. New Jersey,* 308 U.S. 147, 162–63, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

■ Lastly, a valid time, place and manner restriction must allow for alternative channels of communication. The government may not, however, abridge a citizen's right to exercise liberty of expression in an appropriate place simply because that same expression may be exercised in another place. *Cox,* 702 F.Supp. at 902, *quoting Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

The level of scrutiny the Court must apply "is initially tied to whether the stat-

ute distinguishes between prohibited and permitted conduct on the basis of content." *Frisby,* 487 U.S. at 481, 108 S.Ct. 2495. In *Frisby,* individuals who strongly opposed abortion held at least six demonstrations on a public street in front of a doctor's residence. The town of Brookfield, Wisconsin then adopted a municipal ordinance that completely banned picketing "before or about" any residence. Two individuals who wished to continue picketing sought a declaration that the ordinance was facially invalid under the First Amendment. 487 U.S. at 477, 108 S.Ct. 2495. The Supreme Court held that the street in front of the doctor's house in a residential neighborhood was a traditional public forum, and deferred to the district court's finding that the municipal ordinance was facially content neutral—*i.e.,* the ban on all focused picketing did not distinguish between prohibited and permitted speech on the basis of content.[4] 487 U.S. at 481–82, 108 S.Ct. 2495.

The Court then applied the test for whether a statute is narrowly tailored—i.e., it "targets and eliminates no more than the exact source of the 'evil' it needs to remedy." 487 U.S. at 485, 108 S.Ct. 2495. The Court found that the ordinance's complete ban on focused picketing was narrowly directed at the household, not the general public, and that the "First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech." 487 U.S. at 487, 108 S.Ct. 2495. Because of the narrow scope of the Brookfield ordinance, and because

**4.** The municipality had revised the ordinance to omit an exception for labor picketing after reviewing *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (invalidating similar ordinance under the Equal Protection Clause). The individuals challenging the ordinance apparently conceded the law's facial content-neutrality, but argued that state law nevertheless implied an exception for labor picketing. *Frisby,* 487 U.S. at 481, 108 S.Ct. 2495.

"the ordinance prohibited speech directed primarily at those who are presumptively unwilling to receive it," the state had a substantial interest in banning picketing. 487 U.S. at 488, 108 S.Ct. 2495. The ordinance was facially valid under the First Amendment.

### ii. *Content–Based Restrictions*

Content-based restrictions, on the other hand, regulate speech on the basis of the ideas expressed. A content-based restriction is presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Simon & Schuster v. New York Crime Victims Bd.*, 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (*quoting Regan v. Time, Inc.*, 468 U.S. 641, 648–49, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (regulations which "permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment"); *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1569 (11th Cir. 1993) (finding that an ordinance prohibiting nonresidential flag display without a permit unless the flags "represent a governmental unit or body" was content-based and invalid); *Krafchow v. Town of Woodstock*, 62 F.Supp.2d 698, 710 (N.D.N.Y. 1999) (finding that an ordinance prohibiting all political speech and solicitation except political campaigning on a village green was content-based and invalid)). Our society, however, has permitted content-based restrictions in types of speech that are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *R.A.V.*, 505 U.S. at 383, 112 S.Ct. 2538 (*quoting Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)). For a state to enforce a content-based restriction, it must show that the regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. *Perry*, 460 U.S. at 45, 103 S.Ct. 948.

In *Carey v. Brown*, 447 U.S. 455, 459, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), a civil rights organization protested the alleged failure of the Mayor of Chicago to support busing of school children. The protest occurred on the public sidewalk on front of the Mayor's home. The protestors were arrested and charged with violating an Illinois statute that made it a Class B misdemeanor to "picket before or about the residence or dwelling of any person," but permitted the peaceful picketing of a "place of employment involved in a labor dispute." 447 U.S. at 457, 100 S.Ct. 2286. The protestors sought a declaration that the Illinois residential picketing statute was facially invalid under the First and Fourteenth Amendments. The protestors argued that the law was overbroad and vague, and that it imposed an impermissible content-based restriction on protected expression in light of the exception for labor picketing. 447 U.S. at 458, 100 S.Ct. 2286.

The Supreme Court held that the Illinois statute violated the Equal Protection Clause because it selectively proscribed peaceful picketing "on the basis of the placard's message"—*i.e.*, it impermissibly "distinguished between labor picketing and all other peaceful picketing without any showing that the latter was 'clearly more disruptive' than the former." *Carey*, 447 U.S. at 459–60, 465, 100 S.Ct. 2286; *accord, Police Department of Chicago v. Mosley*, 408 U.S. 92, 100, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (invalidating as content-based an ordinance criminalizing picketing in front of schools, but excepting

labor-related picketing). The Court reasoned that the legality of residential picketing depends solely on the nature of the message being conveyed. On its face, the Illinois statute prefers the expression of views about labor disputes, and allows the free dissemination of views on that subject, but restricts discussion of all other issues and subjects. *Carey*, 447 U.S. at 460–61, 100 S.Ct. 2286.

The Supreme Court found that "nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy," and that peaceful labor picketing is no less disruptive than peaceful picketing on issues of broader social concern. 447 U.S. at 465, 100 S.Ct. 2286. The Court observed that labor picketing is no more deserving of First Amendment protection than are public protests over other issues, particularly the economic, social, and political subjects about which the parties before the Court wished to demonstrate. 447 U.S. at 466, 100 S.Ct. 2286.

### c. Overbreadth

■ A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself. *Jacobs v. Florida Bar*, 50 F.3d 901, 905–06 (11th Cir.1995). If a facial challenge is successful, the court will strike down the invalid statute. *Stromberg v. California*, 283 U.S. 359, 369–70, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). For a facial challenge to be successful, a plaintiff generally must establish that no set of circumstances exists under which the law would be valid. *Adler v. Duval County Sch. Bd.*, 206 F.3d 1070, 1083–84 (11th Cir.2000) (*en banc*) (*quoting U.S. v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)).

■ Statutes or regulations may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). This is known as the overbreadth doctrine. *See* Gerald Gunther & Kathleen M. Sullivan, CONSTITUTIONAL LAW 1326—37 (13th ed.1997). A court may invalidate an overly broad law even though the speech at issue could have been proscribed by a more narrowly drawn law. *Id.* Courts invalidate overly broad statutes or regulations because "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *see also United States v. Frandsen*, 212 F.3d 1231, 1236 n. 3 (11th Cir.2000), *quoting Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

■ A plaintiff may facially challenge an overly broad statute even though a more narrowly drawn statute would be valid as applied against the plaintiff. *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 799, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). Courts are circumspect in applying overbreadth, however, for fear that a wide-sweeping overbreadth doctrine would swallow traditional standing requirements. *Id.* As such, the Supreme Court has stated that, in order for the doctrine to apply, a statute's overbreadth must be substantial. *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

While "substantial overbreadth" has never been defined, the Supreme Court has held that "the mere fact that one can conceive of some impermissible applica-

tions of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Vincent,* 466 U.S. at 800, 104 S.Ct. 2118. The overbreadth doctrine stems from the interest of "preventing an invalid statute from inhibiting the speech of third parties who are not before the Court." *Id.* at 800–01, 104 S.Ct. 2118 ("there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds."); *cf. Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (the overbreadth doctrine does not apply to commercial speech).

At least one court of appeals has recognized the similarity between the overbreadth analysis, and the time, place, and manner restriction analysis. *Krantz v. City of Fort Smith,* 160 F.3d 1214, 1218–22 (8th Cir.1998), *cert. denied,* 527 U.S. 1037, 119 S.Ct. 2397, 144 L.Ed.2d 797 (1999) ("we also agree with the district court that plaintiffs' overbreadth challenge is governed by the line of cases addressing time, place and manner restrictions"). Indeed, determining whether a content-neutral statute is narrowly tailored is similar, if not identical, to determining overbreadth.

Logic, if not existing case law, suggests that an overly broad statute cannot be narrowly tailored. Conversely, a narrowly-tailored statute cannot be overly broad. Accordingly, this Court's analysis of the narrowly-tailored prong of the time, place and manner regulation mirrors its overbreadth analysis.

### d. Vagueness

Statutes or regulations may also be invalid because of vagueness.[5] The void-for-vagueness doctrine draws upon the procedural due process requirement that a law must provide "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. De George,* 341 U.S. 223, 231, 71 S.Ct. 703, 95 L.Ed. 886 (1951). A law will be void for vagueness if persons "of common intelligence must necessarily guess at its meaning and differ as to its application...." *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). In analyzing a statute or regulation for vagueness, the court applies a stricter standard for First Amendment challenges than in other contexts. *Smith v. Goguen,* 415 U.S. 566, 572–73, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *compare Grayned v. City of Rockford,* 408 U.S. 104, 105, 92 S.Ct. 2294, 33

---

**5.** The Supreme Court has stated that:

Vague laws offend several important values. First, because we assume man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad

hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.

*Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (internal citations, marks, and footnotes omitted).

L.Ed.2d 222 (1972) (anti-noise ordinance) *with United States v. Nat'l Dairy Products Corp.,* 372 U.S. 29, 29–30, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) (consumer competition statute).

### e. Prior Restraints on Speech

■ A law that prohibits or restricts speech without a permit is a prior restraint on speech. A prior restraint exists "when the government can deny access to a forum for expression before the expression occurs." *United States v. Frandsen,* 212 F.3d 1231, 1236–37 (11th Cir.2000). Plaintiffs may challenge statutes involving prior restraints on speech as facially invalid without demonstrating that "there are no conceivable set of facts where the application of the particular government regulation might or would be constitutional." *Frandsen,* 212 F.3d at 1236, *citing City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). A facial challenge is appropriate when a permit lacks adequate procedural safeguards necessary to ensure against undue suppression of protected speech. 212 F.3d at 1236.

■ A facially valid prior restraint on protected expression contains three procedural safeguards that obviate the dangers of censorship. *Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). First, the burden of going to court to suppress the speech, and the burden of proof once in court, must rest with the government. *Id.; Frandsen,* 212 F.3d at 1238. Second, any restraint prior to a judicial determination may only be for a specified brief time period in order to preserve the *status quo.* Where a licensor "has unlimited time within which

to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion." *Frandsen,* 212 F.3d at 1239, *quoting FW/PBS, Inc., v. City of Dallas,* 493 U.S. 215, 226–27, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (plurality). Third, an avenue for prompt judicial review of the censor's decision must be available. *Freedman,* 380 U.S. at 58–59, 85 S.Ct. 734; *Frandsen,* 212 F.3d at 1238.

### f. Reconsideration of Facial Challenges

"The law of the case" doctrine states that a trial court must follow an appellate court decision on an issue in subsequent trial court proceedings unless the presentation of new evidence or a change in controlling laws compels a different result. *Piambino v. Bailey,* 757 F.2d 1112, 1120 (11th Cir.1985); *see also White v. Murtha,* 377 F.2d 428, 431 (5th Cir.1967); *Terrell v. Household Goods Carriers' Bureau,* 494 F.2d 16, 19 (5th Cir.1974). The law of the case doctrine "applies to all issues decided expressly or by necessary implication; it does not extend to issues the appellate court did not address." *Piambino,* 757 F.2d at 1120.

## III. *APPLICATION*

### A. STANDING

#### 1. *Background Regarding Standing*

On December 29, 2002, Bischoff, Stites and Spangle went to the heavily-trafficked intersection of Irlo Bronson Memorial Highway and Old Vineland Road in Osceola County, Florida, with other members of the Christian Life Family Center, a Baptist Church.[6] They protested Walt Disney World's purported support of homosexuali-

---

6. The Court held an evidentiary hearing on

standing on August 27, 2002. At the hearing,

ty by standing in the median between traffic lanes and on the side of the road, displaying signs and distributing literature to passing vehicles. Protesters carried large signs bearing slogans like "Choose Jesus Over Mickey" and "Disney Promotes Homosexuality." Docket No. 95, Exhibit B. The literature was titled "Why Boycott Disney?," and listed a number of reasons why the protesters believed that Walt Disney, Inc. supported "anti-family activities," including homosexuality, violence, incest, and drug abuse. *Id.,* Exhibit A. Bischoff held a sign and distributed literature. Stites also held a sign, and held literature for others. Spangle distributed literature.

Soon after the protesters arrived at around 8:00 a.m., an Osceola County Sheriff's Deputy identifying herself as Officer Crawford approached Bischoff.[7] The deputy told Bischoff that the protesters were impeding traffic, and that if they did not move, she would have to arrest them. According to Bischoff, the deputy did not answer her inquiries concerning exactly why Bischoff might be arrested, but instead returned to her vehicle and spoke on the radio.

More Osceola County Sheriff's Deputies arrived, and warned the protesters that they were impeding traffic and had to disperse. Officers then arrested Benham, whom Bischoff never saw standing in the road or distributing literature. The officers warned the protesters that anybody who stepped in the road would be arrested. The officers then arrested Bowman and Spangle when they stepped into the road.[8] Bischoff and Stites witnessed these arrests.

After the arrests of Bowman and Spangle, the protesters soon disbanded at around 1:00 p.m., although they had planned to protest until around 5:00 p.m. Both Bischoff and Stites were afraid that they would also be arrested. They have not returned to the intersection of Irlo Bronson Memorial Highway and Old Vineland Road to protest since December 29, 1997, although they expressed a desire to protest again at that location.

### 2. Standing Analysis

All parties concede that Spangle, who was arrested, has standing. Bischoff and Stites claim to have been threatened with arrest for a violation of Fla. Stat. §§ 316.2045 and 316.2055, and the Court addresses their claims collectively.

### a. Findings as to Injury in Fact

The Court finds that both Bischoff and Stites were threatened with arrest, and

---

both Bischoff and Stites testified about the events of December 29, 1997. Defendants cross-examined Bischoff and Stites and introduced in evidence: 1) a copy of the literature distributed by the protesters; 2) a videotape showing some of the events of December 29, 1997; and 3) arrest reports of Spangle, Benham and Bowman. Docket 95. Defendants offered no witnesses of their own. The Court admitted the evidence solely on the issue of standing. Therefore, the facts set forth in the above section on "Background Regarding Standing" may have no bearing on issues

resolved as a matter of law in the rest of this report and recommendation.

7. Plaintiffs believe that Officer Crawford's real name was Officer Gens.

8. Plaintiffs presented no evidence demonstrating that any Osceola County Deputy Sheriffs acted unprofessionally or in a manner inconsistent with their difficult responsibility of enforcing thousands of state and federal statutes.

thereby suffered an injury in fact.[9] *See Bischoff*, 222 F.3d at 884 ("Plaintiffs' testimony that they were threatened with arrest for engaging in free speech activities is evidence of an actual and concrete injury wholly adequate to satisfy the injury in fact requirement of standing."). Bischoff and Stites' unrefuted testimony was credible in this regard. At the hearing, Sheriff Aycock and the Attorney General argued that Bischoff and Stites had suffered no injury in fact because they had never been threatened with arrest for the same activities that led to the arrests of Spangle, Bowman and Benham. Specifically, Defendants maintained that the officers warned the protesters that they would be arrested for stepping into the road to distribute literature, and that Spangle, Bowman and Benham had stepped into the road. Because Bischoff and Spangle did not step in the road, according to Sheriff Aycock and the Attorney General, they suffered no injury from the threat to arrest those who stepped into the road. This argument is meritless.

First, the threat of arrest was not limited to those who stepped in the road—or at least no such limit was proved at the hearing. Sheriff Aycock himself argued in his brief that protesters who did not go into the street, but merely approached vehicles to solicit, nevertheless violated Florida law. Although Sheriff Aycock argued in his memorandum that the conduct of Spangle, Benham and Bowman was more hazardous because they entered the road, according to the Sheriff of Osceola County "those who stood on the grassy island and handed their materials across to drivers ..." also were subject to arrest. Docket

No. 91 at 6, filed August 22, 2002. Sheriff Aycock's contrary argument five days later at the hearing—that persons who distributed literature (Bischoff) or persons who aided and abetted them (Stites) were not subject to arrest—rings hollow.

Second, it is insignificant that Bischoff and Stites may have been threatened with arrest for violating different sub-parts of Fla. Stat. §§ 316.2045 and 316.2055 than those for which Spangle, Benham and Bowman were arrested. As discussed in detail below, these statutes state numerous means by which a defendant might impede traffic or unlawfully distribute handbills. Bischoff and Stites may well suffer an injury-in-fact sufficient to confer standing even if their conduct did not mirror, subsection for subsection or step for step, Spangle's conduct. To deny standing to Bischoff and Stites on this basis would elevate form over substance.

### b. Findings as to Causation

Similarly, Bischoff and Stites have demonstrated a causal link between the injury they suffered and Sheriff Aycock's enforcement of the contested statutes. According to Sheriff Aycock, both Bischoff and Stites were engaged in conduct violative of the same Florida laws for which Osceola County Sheriff's Deputies arrested Plaintiff Spangle. *Bischoff*, 222 F.3d at 885.

### c. Findings as to Likelihood of Redress

Finally, the relief Bischoff and Stites seek, a facial invalidation of the Florida

---

**9.** The "injury-in-fact" analysis is solely for the purposes of addressing standing to challenge the constitutionality of the Florida statutes allegedly affecting Plaintiffs' First Amendment rights. The Court makes no finding critical of Sheriff Aycock or the Osceola County Sheriff's Office.

statutes at issue, would redress their injury if granted. *Bischoff,* 222 F.3d at 885. If Fla. Stat. §§ 316.2045 and 316.2055 are declared invalid, then Bischoff and Stites could return to the same site in Osceola County to protest without fear of arrest for violating these statutes. For the above reasons, Bischoff, Stites and Spangle have standing to contest the constitutionality of these Florida statutes.

## B. FACIAL CHALLENGES UNDER THE CONSTITUTION

### 1. *Reconsideration of Facial Challenges*

The district court first must decide whether to re-examine Fla. Stat. §§ 316.2045 and 2055 on remand in light of the pre-appeal disposition of The Honorable G. Kendall Sharp. Docket 48. Judge Sharp granted summary judgment to former defendants Sheriff Charles Croft and Osceola County on Bischoff and Stites' facial challenges. Judge Sharp relied primarily on a finding that neither plaintiff had standing to challenge either statute, but ruled in the alternative that the two statutes imposed permissible time, place and manner restrictions. *Id.* at 9. The Eleventh Circuit refrained from reviewing the district court's ruling on the merits of Plaintiffs' facial challenges. *See Bischoff,* 222 F.3d at 886. Defendants argue that the Eleventh Circuit's refusal to address the facial challenge prohibits the district court from reconsidering Plaintiffs' facial challenges.

Plainly, the Eleventh Circuit did not address the facial validity of the contested Florida laws. *See Bischoff,* 222 F.3d at 886. Absent a limited remand and clear retention of jurisdiction in the Court of Appeals, a district court is free to re-evaluate its earlier rulings in order to achieve a legally correct result, particularly when the Court of Appeals has provided new enlightenment. Accordingly, the Court proceeds to consider Plaintiffs' facial challenges to Fla. Stat. §§ 316.2045 and 316.2055.

### 2. *Facial Analysis of Fla. Stat. § 316.2045*

Plaintiffs contest the facial validity of Fla. Stat. § 316.2045, a law prohibiting the willful obstruction of public streets, highways and roads. Plaintiffs raise three grounds. First, Plaintiffs contend that Fla. Stat. § 316.2045 is an invalid content-based statute that impermissibly regulates the type of speech allowed in a public forum. Second, Plaintiffs argue that Fla. Stat. § 316.2045 is void for vagueness because it criminalizes conduct that falls within undefined terms, and because it establishes a licensing system that lacks the requisite procedural safeguards. Third, Plaintiffs allege that Fla. Stat. § 316.2045 is overly broad in that it applies to a wide range of protected First Amendment conduct.

Any facial analysis must begin with a very close analysis of the language chosen by the legislature in order to determine the statute's exact reach or scope. *See Frisby,* 487 U.S. at 482, 108 S.Ct. 2495. Section 316.2045 (captioned "Obstruction of public streets, highways and roads") states, in pertinent part:

(1) It is unlawful for any person or persons willfully to obstruct the free, convenient and normal use of any public street, highway or road by impeding, hindering, stifling, retarding, or restraining traffic or passage thereon, by standing or approaching motor vehicles thereon, or by endan-

gering the safe movement of vehicles or pedestrians traveling thereon; and any person or persons who violate the provisions of this subsection, upon conviction, shall be cited for a pedestrian violation, punishable as provided in chapter 318.

(2) It is unlawful, without proper authorization or a lawful permit, for any person or persons willfully to obstruct the free, convenient, and normal use of any public street, highway, or road by any of the means specified in subsection (1) in order to solicit. Any person who violates the provisions of this subsection is guilty of a misdemeanor of the second degree, punishable as provided in § 775.082 or § 775.083. Organizations qualified under § 501(c)(3) of the Internal Revenue Code and registered pursuant to chapter 496, or persons acting on their behalf are exempted from the provisions of this subsection by the state. Permits for the use of any portion of a state-maintained road or right-of-way shall be required only for those purposes and in the manner set out in § 337.406.

(3) Permits for the use of any street, road or right-of-way not maintained

by the state may be issued by the appropriate local government.

(4) Nothing in this section shall be construed to inhibit political campaigning on the public right-of-way or to require a permit for such activity.

Fla. Stat. § 316.2045.

Section one of § 316.2045 makes it unlawful wilfully to obstruct the normal use of any road "by impeding, hindering, stifling, retarding, or restraining traffic or passage" on the road. Section one also prohibits the wilful obstruction of any road's normal use "by standing or approaching motor vehicles thereon." Section one is ambiguous as to whether it is unlawful for an individual to wilfully obstruct the free use of a road simply "by standing," or whether she must do so "by standing ... thereon," *i.e.*, on the road. It is clear, however, from the language of section one that a person may violate § 316.2045(1) by standing without approaching a motor vehicle.

Thus, section one prohibits a person from wilfully retarding traffic by standing on the side of the road, whether or not she is holding a sign.[10] Section one makes no exceptions for political campaigning, for charitable work, or for permitted conduct.

---

**10.** As written, Fla. Stat. § 316.2045 criminalizes all activity that retards traffic. Therefore, any roadside speech—except for exempt § 501(c)(3) speech and political campaigning—whether political or solicitous, will violate the statute. The parties acknowledge that the Plaintiffs' action are more accurately described as "handbilling," an activity traditionally accorded more deference by the Supreme Court. *See United States v. Belsky*, 799 F.2d 1485, 1489 (11th Cir.1986) ("soliciting funds is an inherently more intrusive and complicated activity than is distributing literature"). Nevertheless, the activity may well be considered "solicitation" for the purposes of Fla. Stat. § 316.2045(2)–(4). Indeed, the Attorney General argued at the hearing that

Plaintiff Spangle's arrest record shows that he was arrested for solicitation, even though the protesters' activities bore none of the traditional hallmarks of solicitation. *Heffron*, 452 U.S. at 653, 665, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (Blackmun, J., concurring in part and dissenting in part) ("The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead, the recipient is free to read the message at a later time... [S]ales and the collection of solicited funds not only require the fairgoer to stop, but also 'engender additional confusion ... because they involve acts of exchanging arti-

A person violating section one commits a non-criminal pedestrian violation or infraction punishable by a fifteen dollar fine. Fla. Stat. § 316.2045(1); Fla. Stat. § 316.655(1); Fla. Stat. § 318.13(3); Fla. Stat. § 318.18(1)(a); Fla. Stat. § 775.082(5).[11]

Section two of § 316.2045 similarly makes it unlawful for any person wilfully to obstruct the normal use of a road by any means specified in section one "in order to solicit." The term "solicit" is not defined. Any person who violates section two, however, is guilty of a crime—a second degree misdemeanor punishable by "a definite term of imprisonment not exceeding 60 days," a $500 fine, or both. Fla. Stat. § 316.2045(2); Fla. Stat. § 775.082(4)(b); Fla. Stat. § 775.083(1)(e). The criminality of a defendant's conduct and the possibility that she may spend up to two months in jail depends on whether she has retarded traffic "in order to solicit." The firefighter collecting money in a boot for the families of firefighters killed on September 11 is subject to arrest and up to two months imprisonment, as is the ninth grader hoping to entice cars into a charity car wash.

Unlike section one, section two of § 316.2045 lists three exceptions that de-

criminalize specific activities: 1.) the Internal Revenue Code § 501(c)(3) exception; 2.) the exception for political campaigning; and 3.) the exception for permitted conduct. First, registered organizations qualified under Internal Revenue Code, 26 U.S.C. § 501(c)(3) (list of types of tax exempt organizations)—or *"any persons or organizations acting on their behalf"*— are exempted from section two for activities on roads not maintained by the state. Fla. Stat. § 316.2045(2) (emphasis supplied). Thus, a person acting on behalf of Church A (which qualifies under § 501(c)(3)) may protest, wilfully retard traffic, and solicit with impunity on an Osceola County road, but a Church B parishioner engaged in the very same conduct a few blocks down the same road faces possible imprisonment because Church B is not § 501(c)(3) qualified or registered. Similarly, persons from Church A may protest perceived pro-homosexual bias at Walt Disney World, Inc.—no matter how severe the effect on traffic—but persons protesting on behalf of Disney (which is not likely a § 501(c)(3) corporation) would risk incarceration if they responded from the other side of the same Osceola County road.[12]

Second, section four of Fla. Stat. § 316.2045 states that "[n]othing in this

---

cles for money, fumbling for and dropping money, making change, etc.' ").

**11.** The Florida Legislature adopted the Florida Uniform Disposition of Traffic Infractions Act in order to decriminalize certain violations of Chapter 316, the Florida Uniform Traffic Control Law, thereby facilitating the implementation of a more uniform and expeditious system for the disposition of traffic infractions. Fla. Stat. § 318.12. A person charged with a non-criminal infraction simply signs the citation, and promises to appear. Fla. Stat. § 318.14(2). A person who does not elect to appear, may pay the fine by mail or in person, and is deemed to have admitted the infraction. Fla. Stat. § 318.14(4). Such

admission shall not be used as evidence in any other proceeding. *Id.* There is no right to a trial by jury or a right to court-appointed counsel for a non-criminal infraction. Fla. Stat. § 318.13(3).

**12.** All protesters nevertheless may be subject to non-criminal pedestrian violations under section one, which contains no § 501(c)(3) exemption. Persons who are engaged in "political campaigning," however, are exempt from both pedestrian and criminal violations under sections one and two. *See* Fla. Stat. § 316.2045(4).

section shall be construed to inhibit political campaigning on the public right-of-way or to require a permit for such activity." The term "political campaigning" is not defined. One can surmise from ordinary usage that some conduct is political campaigning: "Vote for Janet Reno;" or "Vote Republican." [13] Other conduct may be less clear, or depend on the context: "Impeach Nixon;" "Support Democrats on Prescription Drugs;" "Defeat the NRA Candidate;" "Vote Pro–Choice;" "Elect Judge Jones" (non-partisan); or perhaps "Choose Mickey." Yet the criminality of a defendant's conduct and the possibility that she may spend up to two months in jail depends on whether she has retarded traffic while "political campaigning." [14] Under all parties' interpretation of § 316.2045, a ninth grader risks a term in the Osceola County Jail if her charity car wash sign slightly retards traffic, but a Nazi party candidate for governor may back up traffic for miles with impunity.

Section 316.2045 specifies a third exception available to law-abiding citizens who do not wish to violate Florida law—obtain a permit. Sections two, three, and four of § 316.2045 decriminalize the wilful retarding of traffic where the solicitor has obtained a permit. Section two specifies that it is only unlawful to solicit "without proper authorization or a lawful permit." Section two is unclear as to whether the words "proper authorization or" are mere surplusage, or whether one can obtain "proper authorization" without obtaining a "lawful permit." [15] In any event, there is no violation of § 316.2045(2) (a second degree misdemeanor) [16] if one obtains a permit. The permit exception should be a useful option for a law-abiding person wishing to avoid criminal conduct. That person may seek a permit's protection because she cannot discern whether her intended conduct is in fact "soliciting," or whether her intended conduct falls within the safe harbor of the § 501(c)(3) exception or the "political campaigning" exception.

But the permit exception is far more complicated than it appears upon first examination. Section 316.2045(3) establishes a permitting rule for roads not maintained by the state. Section three simply states that "[p]ermits for the use of any street, road, or right-of-way not maintained by the state may be issued by the appropriate local government." Section two, however, establishes a different permitting rule for state-maintained roads. Permits for the

---

**13.** Defendants contend that the term "political campaigning" has a "clear meaning traditionally and commonly understood to refer to urging the election of a candidate to office." Docket No. 91 at 7. But the traditional and common understanding may be broader. Political campaigning may include urging the election of a slate of candidates; urging support for a political party; urging the defeat of an opposing candidate; urging the defeat of a proposition or initiative on the ballot; or urging a party-line vote on a political issue.

**14.** Under defendant's understanding of "political campaigning," the Osceola County Sheriff's Office must arrest the group on one side of the street holding "Impeach Clinton" posters, while the group on the other side of the street holding "Re–Elect Clinton" signs would be allowed to remain and wilfully retard traffic.

**15.** Section 337.406 of the Florida Statutes makes it lawful to use a state transportation facility right-of-way in a manner that interferes with traffic movement where the use is "otherwise authorized" by the rules of the Florida Department of Transportation. No such rules appear in the record.

**16.** There may nevertheless be a pedestrian violation. Section one contains no permitting exception.

use of a state-maintained road or right-of-way "shall be required *only for those purposes* and in the manner set out in § 337.406." Fla. Stat. § 316.2045(2) (emphasis supplied). The language of § 316.2045(2) requires a permit for the use of state roads only for certain specified purposes—no permit is otherwise required. Apparently, a solicitor may wilfully retard traffic without a lawful permit so long as he is not using the state road for a purpose specified in Fla. Stat. § 337.406.[17]

But how would a person intending to solicit on a state road determine whether or not he will be using the state road for a specified purpose (and therefore need a permit)? Section 337.406 of the Florida Statutes does not clearly specify those purposes for which a permit is required. Section 337.406 is itself a separate criminal statute—a second degree misdemeanor—punishable by "a definite term of imprisonment not exceeding 60 days," a $500 fine, or both. Fla. Stat. § 337.406(4); Fla. Stat. § 775.082(4)(b); Fla. Stat. § 775.083(1)(e). Under § 337.406(1), it is unlawful to make any use of the right-of-way of a state transportation facility (an undefined term) outside an incorporated municipality in any manner that interferes with the safe and efficient movement of people or property on the facility. Any such use is a *prohibited use*. Prohibited uses include, but are not limited to, the free distribution or display of any goods or property; solicitation for charitable purposes; and the display of advertising of any sort. Fla. Stat. § 337.406(1).

Although no party in this action seeks a declaration that Fla. Stat. § 337.406 is un-

constitutional, our analysis of § 316.2045 is aided by identifying the conduct that § 337.406 criminalizes. Again, the firefighter collecting money in a boot and the ninth grader hoping to entice cars into a car wash are each subject to arrest and a jail term of up to two months if they interfere with the safe and efficient movement of cars. Indeed, § 337.406 not only omits the § 501(c)(3) exemption found in § 316.2045(2), but expressly criminalizes "solicitation for charitable purposes." Furthermore, § 337.406 not only omits the "political campaigning" exemption found in § 316.2045(4), but expressly criminalizes "the display of advertising of any sort." Florida legislators and state judges advertising for re-election or retention along the roadway may join the firefighters and ninth graders in jail.

Section 337.406(1) does provide for permits: "any portion of a state transportation facility may be used for an art festival, parade, fair, or other special event if permitted by the appropriate local governmental entity." The term "other special event" is not defined, and the "appropriate" local governmental entity (*i.e.,* the county, an unincorporated municipality) is not specified. Section 337.406(1) confers on incorporated municipalities special authority to issue permits of limited duration for the temporary use of the right-of-way "*for any of these prohibited uses* if it is determined that the use will not interfere with the safe and efficient movement of traffic and the use will cause no danger to the public." Fla. Stat. § 337.406(1) (emphasis supplied).[18]

But § 337.406(1) is unclear as to whether the term "*these* prohibited uses" refers

---

**17.** Once again, there may nevertheless be a pedestrian violation. Section one contains no permitting exception.

**18.** Section two of Fla. Stat. § 337.406 also permits sales by persons "holding valid peddlers' licenses issued by appropriate governmental entities."

only to uses "for an art festival, parade, fair or other special event." May municipalities also permit other uses prohibited by § 337.406(1), such as charitable solicitation that interferes with traffic movement? The answer may be important not only to someone seeking a permit for soliciting in a municipality, but also to someone who simply wants to avoid using a state road for a purpose specified in Fla. Stat. § 337.406—*i.e.*, a person who has no permit but wants to avoid violating § 316.2045(2). The statute provides no answer. This level of detail in the analysis is necessary because the Florida Legislature chose to make the criminality of a person's conduct under § 316.2045(2) dependent on the "purposes" set forth in § 337.406.

On its face, § 316.2045(2)–(3) seems to decriminalize conduct by a permit holder, but the permit exemptions are illusory. Although forewarned that the Court would inquire about permitting at oral argument, Docket No. 88 at 2, neither Sheriff Aycock nor the Attorney General of the State of Florida could point to a description in the record (or otherwise describe) how one might obtain the permits referred to in Fla. Stat. § 316.2045(2)–(3) (permits for state-maintained and non-state-maintained roads, or other "proper authorization") and § 337.406(1)–(2) (permits for use of state transportation facilities by the appropriate local governmental entity, both outside and within incorporated municipalities, including roads on the State Highway System).

Although Sheriff Aycock and the Attorney General agreed that the intersection of Irlo Bronson Memorial Highway and Old Vineland Road was in unincorporated Osceola County, they could not identify the appropriate local government entity to issue a permit for that location. Also, they were unable to determine whether the intersection was or was not state-maintained.[19] Counsel for the Attorney General was unable to point the Court to any written procedures for obtaining permits, although she orally described what little a colleague had learned about the State of Florida's permitting practice.

According to the Attorney General, a permit seeker would first go to the local government, in this case the Osceola County Sheriff's Office, to request a permit. If a permitting process existed at all in Osceola County, then the Osceola County Sheriff's Office would have the applicant fill out a permit application. Someone at the Osceola County Sheriff's Office would decide "what their interests are in granting or denying the permit." If the Osceola County Sheriff's Office wanted to grant the permit, then the Sheriff's Office would forward the application to an unspecified person at the Florida Department of Transportation, Maintenance Department (location unavailable, although counsel believed that the Maintenance Division had an office in Orange County). Counsel for the Attorney General was uncertain whether someone in the Maintenance Department would then review, grant, or deny the application, and was uncertain whether further review of an adverse decision was possible. The Attorney General could point to no time limits imposed at any stage of the permitting procedure. If

---

19. The Florida Department of Transportation designates roads as state-maintained roads. *See* Fla. Stat. § 316.106(50). Jurisdiction to control traffic on state roads is vested in the Florida Department of Transportation. Fla. Stat. § 316.006(1). Chartered municipalities have jurisdiction over all non-state roads in their boundaries, while counties have jurisdiction over all roads within their boundaries that do not fall under state or municipal jurisdiction. Fla. Stat. § 316.006(2)–(3).

no local permitting procedure existed in a particular county or municipality, then there would be no permitting available at the state level. Sheriff Aycock read into the record a letter stating that Osceola County had no procedure for permitting.[20] Docket No. 98 at 191.

### 3. *Fla. Stat. § 316.2045 Is Content-Based and Vague*

On its face, § 316.2045 regulates speech on the basis of the ideas expressed even though § 316.2045 says nothing about pro-homosexual or anti-homosexual speech, and nothing about pro-Disney or anti-Disney speech. Rather, section 316.2045 selectively proscribes protected First Amendment activity—*i.e.*, it impermissibly prefers speech by § 501(c)(3) charities and by persons who are engaged in "political campaigning" over all other activity that retards traffic, without any showing that the latter is more disruptive than the former. *See Carey*, 447 U.S. at 459–60, 465, 100 S.Ct. 2286; *Mosley*, 408 U.S. at 100, 92 S.Ct. 2286.

Section 316.2045 makes the legality of conduct that retards traffic depend solely on the nature of the message being conveyed. Said differently, the Florida statute facially prefers the viewpoints expressed by registered charities and political campaigners by allowing ubiquitous and free dissemination of their views, but restricts discussion of all other issues and subjects. Section 316.2045 of the Florida Statutes, therefore, is presumptively invalid under the Equal Protection Clause and the First Amendment of the United States Constitution because it imposes content-based restrictions on speech in a traditional public forum.

Furthermore, § 316.2045 does not sufficiently define the conduct that it proscribes when measured by common understanding and practices. As is evident from the above facial analysis, persons of common intelligence (including Osceola County Sheriff's Deputies and the Attorney General of the State of Florida) must necessarily guess at its meaning and differ as to its application. Section one is ambiguous as to whether it is unlawful for an individual to wilfully obstruct the free use of a road simply "by standing," or whether she must do so by standing on the road. The undefined terms "solicit" and "political campaigning" contribute to the indefiniteness of § 316.2045, as does section two's reference to and partial incorporation of the opaque and undecipherable permit provisions of another criminal statute, § 337.406. It is equally problematic that section two creates a different permit scheme from the permit scheme in section three, and that the permit scheme in section two actually seems to criminalize *additional* conduct that would otherwise be exempted under section two, *i.e.*, § 501(c)(3) solicitation and political campaigning. Section 316.2045 therefore is void for vagueness.

### 4. *Section 316.2045 Is Not Narrowly Tailored to Meet a Compelling State Interest, But Rather Is Overbroad*

Because Fla. Stat. § 316.2045 is content-based, it is only valid if narrowly tailored to meet a compelling state interest. *Perry*, 460 U.S. at 45, 103 S.Ct. 948. De-

---

**20.** Apparently some counties and some municipalities have permitting procedures, and others do not. A person's ability to obtain a permit for otherwise criminal conduct may vary from county to county, even along the same road.

termining whether a statute is narrowly tailored is similar, if not identical, to determining overbreadth. Defendants assert that Fla. Stat. § 316.2045 is designed to protect the safety of both motorists and pedestrians. Section 316.2045 supports defendants' assertion. Section 316.2045(2) refers to and adopts the licensing provisions in Fla. Stat. § 337.406. That statute states the legislature's intent:

> Failure to prohibit the use of right-of-way in this manner will endanger the health, safety, and general welfare of the public by causing distractions to motorists, unsafe pedestrian movement within travel lanes, sudden stoppage or slowdown of traffic, rapid lane changing and other dangerous traffic movement, increased vehicular accidents, and motorist injuries and fatalities.

Fla. Stat. § 337.406(1).

The Florida legislature has also stated its interest in uniformity from county to county. Section 316.2045 is part of the Florida Uniform Traffic Control Law. Fla. Stat. § 316.001. The Florida legislature's intent in adopting the Florida Uniform Traffic Control Law was "to make uniform traffic laws to apply throughout the state and its several counties and uniform traffic ordinances to apply in all municipalities." Fla. Stat. § 316.002 (purpose); *accord,* Fla. Stat. § 316.007 (the "provisions of this chapter shall be applicable and uniform throughout this state and in all political subdivisions and municipalities therein ...."). The Florida legislature's intent in decriminalizing the pedestrian violations in Fla. Stat. §§ 316.2045(1) and 316.2055 is "facilitating the implementation of a more uniform and expeditious system for the disposition of traffic infractions." Fla. Stat. § 318.12 (Florida Uniform Disposition of Traffic Infractions Act).

Florida's interest in protecting the safety of persons using a public forum is at least a "significant" governmental objective. *See Heffron,* 452 U.S. at 650, 101 S.Ct. 2559 (content-neutral restriction of speech to rented booths met a significant government interest in maintaining the orderly movement of crowds at a state fairground). The Court assumes without deciding that Florida's desire to protect public safety on the roads is also a "compelling" government interest. Therefore, the Court proceeds to determine whether Fla. Stat. § 316.2045 is narrowly tailored to meet Florida's stated objectives. It is not.

Nothing in the § 316.2045's content-based charity-noncharity distinction or political-nonpolitical distinction has any bearing whatsoever on road safety or uniformity. Speech by a § 501(c)(3) charity and speech by a politician is no more deserving of First Amendment protection than is a public protest over other issues, particularly the economic, social, and political subjects about which the parties before the Court wish to demonstrate. Traffic accidents or backups caused by political campaigners or duly-licensed charitable organizations are no less problematic than traffic accidents or backups caused by other political speakers or non-licensed charitable organizations. *See Krafchow,* 62 F.Supp.2d at 710. These groups' differing political messages are entirely irrelevant to Defendants' stated goal of pedestrian and motorist safety. Furthermore, there are less restrictive alternatives available. Florida could allow all political speech regardless of message on the state's roads, while continuing the prohibition on solicitation. 62 F.Supp.2d at 711, *citing Boos v. Barry,* 485 U.S. 312, 326–27, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (finding the law at issue not narrowly tailored because

1258

"a less restrictive alternative was readily available.").

The language of Fla. Stat. § 316.2045 does nothing to promote Florida's interest in uniform traffic laws and dispositions. The statute's permitting procedure varies as one travels along a given road from county to county, municipality to municipality, and also as one enters and then leaves parts of the road that the Florida Department of Transportation's Maintenance Division maintains. If the Attorney General of the State of Florida was unable to determine whether the intersection in question is state-maintained when the issue is relevant in a federal action, and was unable to identify the proper person to contact for a permit, no law-abiding citizen likely can. The undefined terms "solicit" and "political campaigning," which transform handbilling from a civil pedestrian infraction into a crime, will also encourage varying on-the-spot interpretations by the arresting deputies, not uniformity.[21]

Therefore, Fla. Stat. § 316.2045 is an invalid content-based statute. Section 316.2045 sweeps unnecessarily broadly, and invades the area of protected freedoms. There is a realistic danger that section 316.2045 will significantly compromise recognized First Amendment protections of parties not before the Court. Sec-

tion 316.2045, therefore, is content-based and substantially overbroad. Persons whose expression is constitutionally protected—whether firemen, ninth-graders, politicians, or judges—may well refrain from exercising their rights for fear of arrest and incarceration.

Section 316.2045 also imposes a prior restraint on speech by restricting speech without a permit. A prior restraint exists because the governments of Florida and of each county can deny access to a forum for expression, the borders of Florida's roads, before the expression occurs. The permitting scheme established by § 316.2045 lacks the procedural safeguards necessary to ensure against undue suppression of protected speech. Neither this Court, nor any citizen wishing to engage in legal speech on a Florida road, can determine whether a particular permitting procedure applies to a given stretch of road; whether a particular agency or person has been designated to accept and grant or deny applications; whether any substantive constraints are placed on that person's discretion to deny a license;[22] whether prompt judicial review is available for a denial; and whether there is any time constraint on the issuance or denial of a license. From the face of the statute, it appears that the licensor has unlimited time within which to issue a license, so the risk of

21. Section one of Fla. Stat. § 316.2045 does not, standing alone, have the problems created by the preferences in § 316.2045(2)–(4) for § 501(c)(3) speech, for "political campaigning," and for licensed speech. Standing alone, Fla. Stat. § 316.2045(1) appears to be facially content-neutral. But the Florida legislature chose to include the specified exceptions as important parts of the statute. Absent an express direction as to the legislature's intent, this Court will not sever the unconstitutional parts, and leave section one standing alone. That is a decision for the legislature.

22. The statute provides little guidance even for a permit for the use of a state-maintained road or right-of-way that is within an incorporated municipality. An unspecified local government entity "may" issue a limited and temporary permit for certain ambiguously specified uses if the entity determines that "the use will not interfere with the safe and efficient movement of traffic and the use will cause no danger to the public." Fla Stat. §§ 316.2045(2) and 337.406(1).

arbitrary suppression is as great as the provision of unbridled discretion. *Frandsen,* 212 F.3d at 1239.

### 5. *Facial Analysis of Fla. Stat. § 316.2055*

Plaintiffs contest the facial validity of Fla. Stat. § 316.2055 on three grounds. First, Plaintiffs contend Fla. Stat. § 316.2055 is an invalid time, place and manner restriction. Second, Plaintiffs argue Fla. Stat. § 316.2055 is void-for-vagueness because it criminalizes terms without defining them. Third, Plaintiffs allege that Fla. Stat. § 316.2055 is overly broad and applies to a wide range of protected First Amendment conduct.

Once again, a facial analysis of § 316.2055 begins with a close analysis of the language chosen by the legislature to determine the statute's scope. Section 316.2055 (captioned "Motor vehicles, throwing advertising material in") states, in pertinent part:

> It is unlawful for any person on a public street, highway, or sidewalk in the state to throw into, or attempt to throw into, any motor vehicle, or offer, or attempt to offer, to any occupant of any motor vehicle, whether standing or moving, or to place or throw into any motor vehicle any advertising or soliciting materials or to cause or secure any person or persons to do any one of such unlawful acts.

Fla. Stat. § 316.2055. A person violating § 316.2055 commits a non-criminal pedestrian violation or infraction punishable by a fifteen dollar fine. Fla. Stat. § 316.2055(1); Fla. Stat. § 316.655(1); Fla. Stat. § 318.13(3); Fla. Stat. § 318.18(1)(a); Fla. Stat. § 775.082(5).

Although § 316.2055 makes unlawful the dangerous practice of throwing advertising into a motor vehicle, the statute has a far broader impact on protected speech. The statute also makes it unlawful for any person on a sidewalk to offer soliciting materials to the occupant of a standing motor vehicle. The term "soliciting materials" is not defined. The term "standing" means "the halting of a vehicle, whether occupied or not, otherwise than temporarily, for the purpose of, and while actually engaged in, receiving or discharging passengers, as may be permitted by law ..." Fla. Stat. § 316.106(49).

### 6. *Section 316.2055 Is Not Narrowly Tailored to Meet a Significant State Interest, But Rather Is Overbroad*

Both parties agree that the intersection of Irlo Bronson Memorial Highway and Old Vineland Road is a traditional public forum, and that Fla. Stat. § 316.2055 is a content-neutral statute. Therefore, in order to be valid, Fla. Stat. § 316.2055 must be narrowly tailored to serve a significant government interest, and provide alternative channels of communication. *Grace,* 461 U.S. at 177, 103 S.Ct. 1702. While the safety interest asserted by Defendants is certainly a significant government interest, and alternative channels of communication unquestionably exist, the statute is not narrowly tailored.

Rather, Fla. Stat. § 316.2055 is a remarkably broad statute. Section 316.2055 makes it unlawful for a pedestrian on a sidewalk to hand an advertising leaflet to a willing recipient in a car that has stopped in a metered space or in a private driveway, even though such conduct has no effect on traffic or safety. The statute also makes it unlawful for someone on a roadside to hand "soliciting materials" to passengers in cars that have stopped at a light. Section 316.2055 requires no retard-

ing of traffic, and contains no exceptions for § 501(c)(3) charities, for "political campaigning," or for permitted activity. Because § 316.2055 makes political campaigning unlawful even from the sidewalk, the Florida legislators and state judges who choose to advertise for re-election or retention along Florida's sidewalks and roadways may join the firefighters and ninth graders in line when paying their $15 fines (or in the back of an Osceola County Sheriff's Office prisoner van should they be arrested despite the "sign-and-pay" provisions of Fla. Stat. § 318.14).

Section 316.2055 inhibits the speech of third parties not before the Court, and suppresses considerably more speech than is necessary to serve the stated government purpose of traffic safety and uniformity. It is therefore substantially overbroad, and not narrowly tailored to meet a significant state interest.

Section 316.2055 is also impermissibly vague. Section 316.2055 makes it unlawful to hand into a car any "advertising or soliciting materials." "Advertising or soliciting materials" is undefined. To some people, the term might include political campaign fund-raising materials; a road map containing service station advertisements; a matchbook embossed with the name of a hotel or candidate; a resume; an invitation to join a church or synagogue; a theme park ticket and brochure; or a coupon for a free hamburger at a local restaurant. Section 316.2055 does not provide sufficiently definite warning as to the conduct that it proscribes when measured by common understanding and practices. Persons of common intelligence (again including the Osceola County Sheriff's Deputies and the Attorney General) must necessarily guess at its meaning and differ as to its application.

## IV. *CONCLUSION*

For the above reasons, it is:

**RECOMMENDED** that Defendant Aycock's Motion to Dismiss against Plaintiffs [Doc. 79, filed January 9, 2002] be **DENIED**. It is

**FURTHER RECOMMENDED** that Defendant Butterworth's Motion to Dismiss against Plaintiffs [Doc. 81, filed January 29, 2002] be **DENIED**. It is

**FURTHER RECOMMENDED** that Plaintiffs be found to have standing to pursue their constitutional challenges to Fla. Stat. §§ 316.2045 and 316.2055. It is

**FURTHER RECOMMENDED** that Fla. Stat §§ 316.2045 and 316.2055 be found facially unconstitutional, and declared invalid.

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.

September 19, 2002.